William E. Bender, Esq. (SBN 167887)
Michael B. Sayre, Esq. (SBN 99121)
BENDER & GRITZ, APLC
350 10th Avenue, Suite 900
San Diego, CA 92101
Tel:   (619) 515-0222
Fax:   (619) 515-0221
E-mail: bbender@bendergritz.com

David A. Fox, Esq. (SBN: 254651)
FOX LAW, APC
1221 Camino Del Mar
Del Mar, CA 92014
Tel:   (858) 256-7616
Fax:   (858) 256-7618
E-mail: dave@foxlawapc.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXIS YANCY and JAYDEN YANCY, by and through their Guardian Ad Litem, CATHERINE HAWK, individually and on behalf of the Estate of Tommy Yancy, Junior, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants. | Case No. 3:15-cv-0580-JM-PCL<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT**<br><br>Judge:   Hon. Jeffrey T. Miller<br>Ct. Rm.:  5D<br>Date:    April 10, 2017<br>Time:    10:00 a.m. |

TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 2
A. Plaintiffs' Allegations ........ 2
B. Procedural History ........ 5
III. ARGUMENT ........ 8
A. Good Cause Exists Under Rule 16 to Modify the Operative Scheduling Order ........ 9
B. Under Rule 15, The Court Should Grant Plaintiffs' Request for Leave to Amend With "Extreme Liberality" ........ 10
C. The Joinder Requirements Under Rules 19 and 20 Are Satisfied ........ 13
IV. CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Cases**

*Bowles v. Reade*, 198 F.3d 752 (9th Cir. 1999)......................................................11

*Connick v. Thompson*, 563 U.S. 51 (2011)............................................................13

*DCD Programs, Ltd. v. Leighton*, 833 F.2d 183 (9th Cir. 1987) ............................11

*Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371 (9th Cir. 1980)................9

*Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828 (1992)...........13

*Flores v. County of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014)............................12

*Foman v. Davis*, 371 U.S. 178 (1962) ....................................................................11

*Int'l Ass'n of Machinists & Aerospace Workers v. Republic Airlines*, 761 F.2d 1386
  (9th Cir. 1985)......................................................................................................11

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992) .....................9

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)....................................12

*Maxwell v. Cty. of San Diego*, 708 F.3d 1075 (9th Cir. 2013) ................................12

*Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000) ...................................................13

*SAES Getters SpA v. Aeronex, Inc.*, 219 F. Supp. 2d 1081 (S.D. Cal. 2002) .9, 11, 13

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966)...........................13

*United States v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.*, 889 F.2d 1248 (2d Cir.
  1989)....................................................................................................................10

*United States v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011)...........................11

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014 (9th
  Cir. 1981).............................................................................................................12

**Rules**

Fed. R. Civ. P. 15.............................................................................................8, 9, 11

Fed. R. Civ. P. 16.............................................................................................8, 9, 11

Fed. R. Civ. P. 19.............................................................................................8, 9, 13

Fed. R. Civ. P. 20.......................................................................................8, 9, 13, 14

S.D. Cal. Civil Local Rule 15 ........................................................................................ 8

# I. INTRODUCTION

This case arises out of a May 2014 incident, in which plaintiffs Alexis and Jayden Yancy's ("Plaintiffs") father, Tommy Yancy, Jr. ("Yancy"), died at the hands of several California Highway Patrol ("CHP") officers. (*See* ECF No. 46, SAC ¶¶ 39-51.) In their initial pleadings, Plaintiffs asserted claims against the CHP officers directly involved in the incident. (*See generally* ECF Nos. 1, 13, 46.) A substantial portion of discovery now complete, it is clear the already-named officer defendants lacked adequate supervision and training leading up to, and at the time of, the incident, and that this lack of supervision and training was a moving force in the cause of Yancy's wrongful death. Plaintiffs therefore seek leave to file a third amended complaint that asserts claims against those individuals responsible for supervising and training the officer defendants.

Specifically, Plaintiffs request leave to assert two additional claims against each of the supervisors responsible for the conduct and training of the already-named officer defendants: (1) a section-1983 claim against these supervisors in their individual capacities and (2) a state-law cause of action for negligent supervision and training against these supervisor in their individual capacities, for which the State of California (by and through CHP) is vicariously liable pursuant to California Government Code section 815.2.

Plaintiffs have consistently alleged the theory that "one or more DOE Defendants was at all material times responsible for the hiring, *supervision*, and discipline of other Defendants," that "*supervisors* . . .are liable for the acts of *their* officers," and that Yancy's death arose from a failure to ensure the individual defendants were equipped with "appropriate education and training." (SAC ¶¶ 28, 113, 126). It should, therefore, come as no surprise that Plaintiffs now wish to confirm these theories of liability in an amended pleading.

Moreover, while about a month of discovery remains (ECF No. 69 at 2), absolutely no new discovery is needed. (Fox Decl. ¶ 9.) Because granting Plaintiffs

leave to amend would not unduly prejudice any existing or proposed party, and because Plaintiffs have been diligent in their efforts to pursue their claims of supervisory liability, the Court should grant Plaintiffs' Motion for Leave to Amend.

## II.   BACKGROUND

### A.   Plaintiffs' Allegations

On May 11, 2014, at 1:22 p.m., defendant Gilbert Caldera ("Caldera") pulled Yancy over because Yancy's front license plate was not affixed to his front bumper (it was facing outward on the passenger's side of the dashboard). (Fox Decl. ¶ 10, Ex. A, Proposed TAC ¶ 21.)

By 1:30 p.m., Yancy was unresponsive. (Proposed TAC ¶ 21.)

By 2:36 p.m., Yancy was pronounced dead. (*Id.*)

Yancy was, at the time of his death, a 32-year-old black man, U.S. Army veteran and father of two. (*Id.* ¶ 22.) Plaintiffs Alexis and Jayden Yancy were 14 and 8-years-old, respectively, at the time of their father's death. (*Id.*)

What apparently began as a routine traffic stop in Imperial, California quickly, and unnecessarily, escalated into a deadly situation. (*Id.* ¶ 23.) After pulling Yancy over, Caldera claims he smelled the odor of marijuana in Yancy's car and, on this basis, was going to ask Yancy to exit his car. (*Id.*) Caldera claims Yancy told him that he was a veteran and that Yancy felt Caldera (who had pulled Yancy over in the past) was harassing Yancy by pulling him over for something as small as a missing front license plate. Caldera also claims Yancy told Caldera that Yancy thought it was legal to drive with a license plate affixed only to the back bumper. (*Id.*) Before asking Yancy to exit the car, Caldera called for backup. (*Id.*)

Defendant Heracilo Cardenas ("Cardenas") was the first to respond. (*Id.* ¶ 24.) Contrary to applicable policies and training materials, Caldera and Cardenas did not pause to formulate a plan, wait for additional backup, or even assess the need for additional backup. (*Id.*) Neither did Cardenas attempt to confirm the basis for Caldera's

2

impending demand that Yancy exit his car. (*Id.*)  Rather, once Cardenas arrived, he and Caldera immediately approached Yancy and demanded that Yancy exit his vehicle without providing Yancy any explanation. (*Id.* ¶ 25.)

Caldera and Cardenas claim Yancy (apparently triggered by the officers' sudden escalation) became verbally upset. (*Id.*)  Contrary to applicable policies and training materials, Caldera and Cardenas did not then pause to further assess the situation, talk to Yancy, formulate a plan, or wait for additional backup. (*Id.*)  Instead, Caldera immediately grabbed inside the car and yanked on Yancy's wrist to get him out. (*Id.*) Relenting to Caldera's efforts, Yancy pulled his wrist from Caldera's grip, opened the driver's door, and stood between the car and the open driver's door, now facing the officers, with empty hands and in clear distress. (*Id.*)

In response, Caldera used his CHP-issued canine to subdue Yancy: a subject with noted signs of distress, who was neither fleeing, actively resisting, or even approaching the officers. (*Id.* ¶ 26.)  In fact, Caldera claims he first attempted to remotely release his canine but his remote control malfunctioned, so he left Cardenas alone with Yancy, traveled back to his patrol car, and manually released the canine. (*Id.*)  Once out of the patrol car, Caldera at first held the canine by its harness. (*Id.*)  Caldera states he then told Yancy to get down on the ground or he would release the canine to bite Yancy. (*Id.*)  Caldera claims Yancy refused and, within less than thirty seconds after getting the canine out of the patrol car, Caldera—contrary to applicable policies and training materials—released the canine, ordering it to attack Yancy who was still standing between his car and open driver's door. (*Id.*)

The canine latched onto the outside of Yancy's left forearm. (*Id.* ¶ 27.)  Yancy attempted to defend himself from the attack. (*Id.*)  At the same time, Caldera charged at Yancy and the canine, knocking them both to the ground. (*Id.*)  As Caldera was on Yancy and the canine, Cardenas struck Yancy's back with a baton before firing a TASER at Yancy, embedding the TASER darts in Yancy's lower back, while

3

entangling and shocking Caldera in the process. (*Id.*)

Defendant Robert Gonzales ("Gonzales") arrived next to find a subdued and non-resisting Yancy. (*Id.* ¶ 28.) In fact, after Caldera pulled the canine away, Yancy voluntarily rolled onto his stomach and put his hands behind his back to be cuffed. (*Id.*) Thus, while Caldera stood up and walked the canine back to his patrol car, Gonzales and Cardenas handcuffed Yancy in the prone position. (*Id.*) Yancy lay handcuffed on the ground for several minutes, with blood oozing from the puncture wounds left by the canine and TASER and from the lacerations caused by being tackled to the ground. (*Id.*) Having been bitten several times by the canine, hit by a baton, tased, and tackled, Yancy did not move. (*Id.*) Caldera then returned from the patrol car and plunged his knee into Yancy's back. (*Id.*)

After minutes of Yancy lying face down and bleeding on the ground, Caldera brought Yancy to a standing position while Cardenas stood nearby with his TASER drawn. (*Id.* ¶ 29.) Having a hold of Yancy's left arm and neck, Caldera began walking Yancy to a patrol car, apparently muttering something to Yancy along the way. (*Id.*) As Yancy turned his head to the left in apparent response to Caldera's words, Caldera suddenly pulled Yancy to the ground for a second time, slamming Yancy's head into a patrol car in the process, leaving a bloody dent in the side of the patrol car. (*Id.*)

On the ground again, the officers rolled Yancy onto his stomach (hands still cuffed behind his back), and Caldera (a large man) kneeled and pressed on the back of Yancy's body, along with Cardenas and Gonzales. (*Id.* ¶ 30.)

At this point, several other officers arrived and immediately piled on Yancy (still handcuffed and lying on his stomach), including defendants Salvador Acevedo ("Acevedo") and Fernando Alvarez ("Alvarez"). (*Id.* ¶ 31.) Contrary to applicable policies and training materials, the officers on top of Yancy did not take care to avoid obstructing Yancy's breathing, or to avoid vital areas such as the head and neck. (*Id.*) Acevedo, for example, kneeled and pressed on Yancy's upper back and neck. (*Id.*) This

4

pressure coincides with the medical examiner's finding that Yancy's hyoid bone was fractured (something that generally occurs after tremendous pressure is applied to the neck). (*Id.*) Within moments of Acevedo and Alvarez's arrival, Yancy was unresponsive. (*Id.*)

Minutes then passed before the officers rendered first aid and allowed paramedics (who the officers had held off) to treat Yancy. (*Id.* ¶ 33.) It was, however, too late. (*Id.*) Neither the officers, paramedics, nor emergency department doctors and nurses were able to revive Yancy. (*Id.*) Approximately one hour after Caldera pulled him over for a missing front plate, Yancy was pronounced dead. (*Id.*)

**B.   Procedural History**

Plaintiffs filed their currently operative SAC on August 28, 2015, asserting claims pursuant to section 1983, in addition to various state tort and wrongful-death claims. (ECF No. 46, SAC ¶¶ 52-135). These included claims and allegations that "DOE defendants" failed to adequately supervise the named defendant officers in the case. (SAC ¶¶ 28, 113, 126). At the time Plaintiffs filed their SAC, they had limited information regarding the specific supervision over, and training received by, the officer defendants and, in particular, Caldera, Cardenas, and Acevedo (all three, "Officer Defendants"). (Fox Decl. ¶ 4.)

After many schedule changes and several weeks of holidays at the end of last year and early this year, Plaintiffs deposed the Officer Defendants, among others. (*Id.* ¶ 5.) These depositions revealed the Officer Defendants lacked adequate supervision and training leading up to, and at the time of, the incident, and that this lack of supervision and training was a moving force in causing Yancy's wrongful death in violation of his civil rights. (*Id.*)

The officers could not, for example, recall receiving training that emphasized the importance of avoiding a subject's head and neck during a physical encounter. (*Id.* ¶ 6.) Neither could they recall receiving training regarding the use of de-escalation

1 techniques on individuals who are apparently distressed or agitated prior to, or in
2 conjunction with, the use of physical force.  (*Id.*)
3 
4 
5 (Proposed TAC ¶ 37.)
6                                                                                                 (*Id.*)
7 
8              (*Id.*)
9                                                                    (*Id.*)
10 
11          (*Id.*)
12 
13 
14                                                         (*Id.* ¶ 38.)
15 
16 
17                                                          (*Id.*)
18                                                                      (*Id.*)
19 
20              (*Id.*)                                                              (*Id.*)
21                                                                (*Id.* ¶ 39, Att. A,            .)
22 
23                                              (Proposed TAC ¶ 39.)
24 
25                                                  (*Id.*)
26                                                                     (*Id.*)
27 



1 ██████████████████████████████████████████████████████████
2 ██████████████████████████████████████████████████████████
3 ██████████████████████████████████████████████████████████
4 ████████████████████████████████.[1]  (*Id.* ¶ 39.)
5    ██████████████████████
6 ██████████████████████████████████████████████████████████
7 ██████████████████████████████████████████████████████████
8 ████████████████████████████████████████  (Fox Decl. ¶ 7, Proposed TAC ¶ 36.)  The Supervisor Defendants were, more specifically, each responsible for supervising the Officer Defendants for a period of time sufficient to know the Officer Defendants lacked the necessary training and skills to appropriately handle an event like the one giving rise to this action. (Proposed TAC ¶ 40.)  The Supervisor Defendants were aware, ██████████████████████████ that Caldera and Cardenas in particular were unprepared to a handle a confrontational or otherwise distressed subject, and that Caldera and Cardenas were likely to use an excessive amount of force in response to such a subject. (*Id.*)  The Supervisor Defendants nonetheless were deliberately indifferent to this risk. (*Id.*)

The deadline to file a motion for leave to amend passed on September 1, 2016, (see ECF No. 64 at 1). Plaintiffs' counsel has, however, endeavored to file this Motion as soon as was practicable. (Fox Decl. ¶ 8.) Counsel have had a very professional relationship throughout this litigation. (*Id.*) Plaintiffs have, for example, provided Defendants several extensions to provide discovery responses necessary to prepare for the foregoing depositions. (*Id.*) Additionally, Plaintiffs sought to secure earlier dates for the foregoing depositions, but Defendants' law-enforcement schedules have not

---

[1] ██████████████████████████████████████████ (Proposed TAC ¶ 39 n.1.) ██████████████████████████████████████████████████████████ (*Id.*)

always worked for these earlier dates. (*Id.*)

Plaintiffs have consistently alleged the theory that "one or more DOE Defendants was at all material times responsible for the hiring, supervision, and discipline of other Defendants," that "*supervisors* . . . are liable for the acts of *their* officers," and that Yancy's death arose from a failure to ensure the individual defendants were equipped with "appropriate education and training." (SAC ¶¶ 28, 113, 126). The Supervisor Defendants have, therefore, been on notice that Plaintiffs would seek to hold them responsible.

In essence, Plaintiffs request leave to amend only to clarify this theory of liability by asserting two additional claims against the now-known Supervisor Defendants: (1) a section-1983 claim against the Supervisor Defendants in their individual capacities, and (2) a state-law cause of action for negligent supervision and training against the Supervisor Defendants in their individual capacities, for which the State of California (by and through CHP) is vicariously liable under California Government Code section 815.2. (Proposed TAC ¶¶ 55-60, 129-134.) Plaintiffs do not intend to conduct any additional discovery based on these causes of action. (Fox Decl. ¶ 9.)

Pursuant to Civil Local Rule 15.1.b, Plaintiffs have submitted herewith a copy of their Proposed TAC, and a version of the same that shows, through redlining, how the Proposed TAC differs from the currently operative SAC. (Fox Decl. ¶ 10, Exs. A & B.)

### III.   ARGUMENT

Plaintiffs' Motion brings into consideration Federal Rules of Civil Procedure 16, 15, and 19 or 20. More specifically, a "party seeking to amend [a] pleading after [the] date specified in [the operative] scheduling order must first show 'good cause' for amendment under Rule 16(b), then, if 'good cause' be shown, the party must demonstrate that amendment was proper under Rule 15." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) (citation omitted). Further, where

a party seeks to name additional defendants, either Rule 19's standard for compulsory joinder or Rule 20's standard for permissive joinder also applies. *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1374 (9th Cir. 1980); *SAES Getters SpA v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1085-86 (S.D. Cal. 2002). Plaintiffs address each of these rules in turn.

### A. Good Cause Exists Under Rule 16 to Modify the Operative Scheduling Order

Rule 16(b)(4) provides that a scheduling order "may be modified only for good cause and with the judge's consent." "A court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under . . . Rule 15." *Johnson*, 975 F.2d at 609 (quotation marks & citation omitted). "Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment." *Id.* That is, "[t]he district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. . . . If that party was not diligent, the inquiry should end." *Id.*

Good cause exists to modify the operative scheduling order because Plaintiffs have been diligent in the pursuit of their proposed claims. With about a month of discovery remaining, Plaintiffs have reviewed thousands of pages of documents produced by Defendants, in addition to taking the depositions of most individual defendants, including the Officer Defendants. Plaintiffs have brought this Motion within a reasonable time following review of key documents and depositions of key witnesses. That is, Plaintiffs have been diligent in ensuring they have a reasonable basis on which to allege their proposed claims.

Neither the already-named nor proposed defendants would suffer undue

prejudice if the Court extends the deadline to file a motion for leave to add claims and join parties. First, one of the reasons Plaintiffs have only recently been able to uncover the basis for their proposed claims is that Plaintiffs have given Defendants several extensions of time to respond to Plaintiffs' discovery requests.

Second, while about one month of discovery remains, key documents have already been produced, and key depositions have already been taken. Thus, Plaintiffs do not intend to propound any additional discovery requests. In any event, the burden of discovery, standing alone, does not constitute undue prejudice. *See United States v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989).

Moreover, because the California Attorney General's Office is representing the already-named defendants and would also represent the proposed defendants, the proposed defendants' interests have been, and will continue to be, represented in this litigation. There is, therefore, little chance the legal rights of either the already-named or the proposed defendants would be unduly prejudiced by amendment.

Further, the proposed defendants have been notice, at least since the filing of Plaintiffs' SAC, that Plaintiffs would seek to hold those "responsible for the hiring, training, supervision, and discipline of other Defendants," ensure that the "supervisors . . . are liable for the acts of *their* officers," and noted that they failed to provide adequate training. (SAC ¶¶ 28, 113, 126.)

In sum, because Plaintiffs have been diligent in pursuing their proposed claims, and because no undue prejudice would result if amendment were allowed, "good cause" exists to amend the operative scheduling order. As such, the Court should amend the applicable deadline pursuant to Rule 16(b)(4) and consider Plaintiffs' request for leave to amend under the following rules.

**B.    Under Rule 15, The Court Should Grant Plaintiffs' Request for Leave to Amend With "Extreme Liberality"**

Under Rule 15(a)(2), leave to amend a pleading after a responsive pleading has

10

been filed may be allowed by stipulation or leave of court. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Granting leave to amend rests in the sound discretion of the trial court. *Int'l Ass'n of Machinists & Aerospace Workers v. Republic Airlines*, 761 F.2d 1386, 1390 (9th Cir. 1985). Though, this discretion must be guided by the strong federal policy favoring the disposition of cases on the merits and permitting amendments with "extreme liberality." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quotation marks & citation omitted).

In assessing the propriety of amendment, courts may consider several factors, including: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by amendments previously permitted; (4) prejudice to the opposing party; and (5) futility of amendment (all five together, the "*Foman* factors"). *Foman*, 371 U.S. at 182; *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011). "[T]he general rule is that amendment . . . is to be permitted unless the opposing party makes a showing of [one of the foregoing factors]." *SAES Getters SpA*, 219 F. Supp. 2d at 1086 (citing *Foman*, 371 U.S. at 182). These factors are not, however, equally weighted.

The possibility of delay alone, for instance, cannot justify denial of leave to amend, *DCD Programs*, 833 F.2d at 186, unless combined with a showing of prejudice, bad faith, or futility of amendment. *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). The single most important factor is whether prejudice would result to any non-movants as a consequence of amendment. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1053 n.68 (9th Cir. 1981).

While it is not Plaintiffs' burden to make a showing of the *Foman* factors, analysis of these factors weighs in favor of granting leave to amend. There has been no undue delay in filing this Motion because, as set forth above, Plaintiffs have been diligent in discovering the facts that would reasonably support addition of Plaintiffs'

11

1  proposed claims against the Supervisor Defendants.  There is no evidence of bad faith
2  or a dilatory motive on Plaintiffs' part.  And while Plaintiffs have had previous
3  opportunities to amend, Plaintiffs did not (until recently) know of the facts giving them
4  a reasonable basis on which to assert their proposed claims.  As described above, neither
5  the already-named nor proposed defendants will suffer under prejudice if amendment
6  is permitted.  Finally, Plaintiffs' proposed claims are not futile.

7        With regard to Plaintiffs' proposed section-1983 claim, the Ninth Circuit
8  approved, in *Larez v. City of Los Angeles*, of an instruction that the jury could find a
9  police chief individually liable if he "set[ ] in motion a series of acts by others, or
10 knowingly refused to terminate a series of acts by others, which he kn[e]w or
11 *reasonably should [have] know[n]*, would cause others to inflict the constitutional
12 injury."  946 F.2d 630, 646 (9th Cir. 1991) (citations omitted).  In other words, a
13 supervisor can be held liable in his or her individual capacity if he or she "knew of
14 the violations and failed to act to prevent them." *Maxwell v. Cty. of San Diego*, 708
15 F.3d 1075, 1086 (9th Cir. 2013).

16       Moreover, as the Ninth Circuit explained in *Flores v. County of Los Angeles*,
17 plaintiffs must show that a supervisory defendant "was deliberately indifferent to the
18 need to train subordinates, and the lack of training actually caused the constitutional
19 harm or depravation of rights."  758 F.3d 1154, 1159 (9th Cir. 2014)  Under this
20 standard, the supervisor must have "disregarded the known or obvious consequences
21 that a particular omission in their training program would cause . . . employees to violate
22 citizens' constitutional rights."  *Id*. (quoting *Connick v. Thompson*, 563 U.S. 51, 51-52
23 (2011)).

24       As for Plaintiffs' proposed state-law claim for negligent supervision and training,
25 California case law recognizes the theory that an employer can be liable to a third person
26 for negligently hiring, supervising, or retaining an unfit employee. *Evan F. v. Hughson*
27 *United Methodist Church*, 8 Cal. App. 4th 828, 836 (1992).  Liability is based on the

fact that an employer knew or *should have known* that its employee created a particular risk or hazard and that particular risk or hazard materializes. *Id.* at 836-37.

Here, Plaintiffs' Proposed TAC sets forth plausible claims against the Supervisor Defendants under the foregoing federal and state-law theories. Plaintiffs' proposed amendments are not, therefore, futile.

In sum, unless the already-named or proposed defendants satisfy their burden of demonstrating why leave to amend should not be granted under the *Foman* factors, the Court should grant Plaintiffs' request for leave to amend under Rule 15.

**C.     The Joinder Requirements Under Rules 19 and 20 Are Satisfied**

Under the Federal Rules of Civil Procedure, "joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966).

> Under Rule 19, a person shall be joined as a party provided he is subject to service of process in the venue where joinder is sought, if joinder will not destroy subject matter jurisdiction, and if the person's joinder is required to accord complete relief among those already parties. Fed. R. Civ. P. 19(a). Under Rule 20, joinder is permissible if the claim against the person arises out of the same transaction or occurrence as that already at issue, and if there is any question of law or fact common to all the parties and persons to be joined. Fed. R. Civ. P. 20(a). Provided those requirements are met, leave to amend to add an adverse party is governed by the general amendment provisions of Rule 15(a).

*SAES Getters SpA*, 219 F. Supp. 2d at 1085 (citing *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465-466 (2000)).

Here, Rule 19's requirements for joinder are satisfied because, first, joinder of the proposed defendants will not destroy this Court's subject-matter jurisdiction. This is because this Court's subject-matter jurisdiction is based on the existence of a federal question, namely, resolution of Plaintiffs' claims under section 1983. Second, joinder of the proposed defendants is required for Plaintiffs to obtain complete relief. This is because Plaintiffs have learned, through discovery, that the Officer Defendants' lack of adequate supervision and training was a moving force in causing Yancy's death. Thus,

13

1  to hold accountable all those responsible for Yancy's death, Plaintiffs must also seek
2  relief against the Supervisor Defendants.
3        Joinder under Rule 20 is also appropriate because, first, the proposed defendants
4  were a moving force in the cause of Yancy's death, making them contributors to the
5  same occurrence giving rise to this action.  Second, the same question of whether
6  Defendants' conduct violated Yancy's rights and injured Plaintiffs is the same question
7  of whether the proposed defendants' conduct violated Yancy's constitutional rights and
8  injured Plaintiffs.  Finally, for the reasons outlined under the *Foman* factors, above,
9  joinder of the proposed defendants comport with principles of fundamental fairness and
10 would not result in prejudice to any party, existing or proposed.  Both of Rules 19 and
11 20 satisfied, Plaintiffs' request to join the Supervisor Defendants should be granted.

## IV.  CONCLUSION

13       For the foregoing reasons, the Court should (1) amend the operative scheduling
14 order to permit consideration of Plaintiffs' request for leave to amend and (2) grant
15 Plaintiffs' request for leave to file their Proposed TAC.

16 Dated:  March 6, 2017                       FOX LAW, APC

17                                        By:   s/ David A. Fox___
18                                            David A. Fox, Esq.
19                                            Attorneys for Plaintiffs