1  XAVIER BECERRA
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  DOUGLAS E. BAXTER
   Deputy Attorney General
4  State Bar No. 201351
    600 West Broadway, Suite 1800
5   San Diego, CA 92101
    P.O. Box 85266
6   San Diego, CA 92186-5266
    Telephone:  (619) 738-9567
7   Fax:        (619) 645-2581
    E-mail:  Douglas.Baxter@doj.ca.gov
8  *Attorneys for Defendants State of California
   (by and through the California Highway
9  Patrol); Gilbert Caldera; Heraclio
   Cardenas; Robert Gonzales; Fernando
10 Alvarez; Salvador Acevedo; and Wesley
   Boerner*

11

12              **IN THE UNITED STATES DISTRICT COURT**

13              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

14

15

| 16 | ALEXIS YANCY, et al., | Case No.: 15-cv-0580 JM (PCL) |
|---|---|---|
| 17 | Plaintiffs, | |
| 18 | v. | and related case of 15-cv-334 JM (PCL) |
| 19 | STATE OF CALIFORNIA; CALIFORNIA HIGHWAY PATROL, et al. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR (1) AUTHORIZATION TO NAME NEW EXPERT WITNESS AND (2) FOR CONTINUANCE OF TRIAL** |
| 20 | | |
| 21 | Defendants. | |
| 22 | LAWANDA MOSES, et al., | Date:       Ex Parte |
| 23 | Plaintiffs, | Time:       Ex Parte<br>Courtroom:  5D (5th Floor Schwartz)<br>Judge:       The Honorable Jeffrey T. Miller |
| 24 | v. | |
| 25 | STATE OF CALIFORNIA; CALIFORNIA HIGHWAY PATROL, et al. | |
| 26 | | |
| 27 | Defendants. | |

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Statement of the Facts ................................................................................................ 1

Argument ................................................................................................................... 4

    I.    Good Cause Exists to Allow Defendants to Name a New Forensic Pathology Expert ....................................................................... 4

    II.   Good Cause Exists to Continue the Trial By Six Months to Allow Defendants to Locate and Name a New Forensic Pathology Expert and Have That Expert Conduct the Extensive Work Necessary to Prepare Opinions and Reports, Submit to Deposition, and Prepare for and Testify at Trial ................................. 14

Conclusion ............................................................................................................... 16

i

MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Point of Care, Inc. v. Epocal, Inc.*
  868 F. Supp. 2d 1310 (N.D. Ala. 2012) ................................................................ 8

*Fox v. County of Tulare*
  No. 1:11-cv-00520-AWI-SMS, 2013 WL 5670871 (E.D. Cal. Oct.
  16, 2013) ............................................................................................................... 9

*Johnson v. Mammoth Recreations, Inc.*
  975 F.2d 604 (9th Cir. 1992) ......................................................................... 6, 15

*Lawrey v. Kearney Clinic, P.C.*
  No. 8:11-CV-63, 2012 WL 3871659 (D. Neb. Sept. 6, 2012) ............................. 7

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*
  218 F.R.D. 667 (C.D. Cal. 2003) ....................................................................... 15

*Nalder v. West Park Hospital*
  254 F.3d 1168 (10th Cir. 2001)............................................................................ 9

*Noyes v. Kelly Services*
  488 F.3d 1163 (9th Cir. 2007) ....................................................................... 5, 15

*Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*
  No. 10- 21511-CIV, 2010 WL 4225947 (S.D. Fla. Oct. 21, 2010) ..................... 8

*Rodriguez v. County of Stanislaus*
  No. 1:08-CV-00856 OWW, 2010 WL 2720940
  (E.D. Cal. July 8, 2010) ........................................................................................ 8

*Southern California Edison Co. v. Lynch*
  307 F.3d 794 (9th Cir. 2002) ......................................................................... 5, 14

**COURT RULES**

Federal Rules of Civil Procedure:

  Rule 6(b) ............................................................................................................... 5
  Rule 16(b)(4) .................................................................................................. 5, 14

MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

**INTRODUCTION**

By this motion, Defendants State of California (by and through the California Highway Patrol); Gilbert Caldera; Heraclio Cardenas; Robert Gonzales; Fernando Alvarez; Salvador Acevedo; and Wesley Boerner respectfully ask this Court for (1) authority to name a new expert witness in forensic pathology and (2) continuance of the trial by six months to allow time to obtain the new witness, allow time for the new witness to review and analyze the extensive materials in the action, and allow the new witness time to prepare an expert report, submit to deposition, and prepare for testimony at trial.  This motion is necessary because there are complex contests over the cause of death of Plaintiffs' decedent (Tommy Yancy, Jr.) and because the Defendants' forensic pathology expert – Vincent Di Maio, M.D. - just suffered a stroke that prevents him from assisting any further in this case.  With the loss of this expert, Defendants will be severely prejudiced in their ability to present their theory of the cause of death of Plaintiff's decedent.  Defendants need to replace this expert in order to fully and fairly present the scientific evidence that supports their contentions about how Mr. Yancy died.

Defendants are requesting 90 days to locate and designate a new forensic pathology expert.  Defendants are then requesting that this expert's initial written report be due within 60 days of the date the expert is designated.  Defendants request that any rebuttal reports that Plaintiffs will submit in response to the new expert's report be due within 30 days of service of the new expert's report.  Defendants request that the trial be continued by a period of six months from the current trial date of August 7, 2017.

**STATEMENT OF THE FACTS**

This is a civil rights action, in which Plaintiffs contend that the CHP and the named CHP Officers engaged in excessive force during an encounter with Tommy

1
MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME
NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

Yancy, Jr.[1] on May 11, 2014, in the City of Imperial, California. Plaintiffs have also named the City of Imperial and two Imperial Police Department Officers as Defendants. Plaintiffs contend that Defendants wrongfully caused the death of Mr. Yancy. Plaintiffs bring federal and state law claims. Defendants contend that there was no excessive force and that they are not liable for Mr. Yancy's death.

One of the fundamental contested issues in this case is the cause of Mr. Yancy's death. This is not a shooting case, where the person involved with police officers was clearly shot and killed. Rather, it is a case where a traffic stop evolved into physical struggles between Mr. Yancy and police officers and in which Mr. Yancy passed away. In the course of the struggles, a police canine was deployed, a Taser was used, 1 to 2 baton strikes occurred, and efforts were made to restrain Mr. Yancy on the ground. Plaintiffs contend that Mr. Yancy died because of excessive force that caused Mr. Yancy to become physically exhausted and to suffocate from neck and possibly back/chest compression. Defendants contend that Mr. Yancy was aggressive and combative, was in a schizophrenic frenzy exacerbated by marijuana use and failure to take his prescribed antipsychotic medication, had a dangerously enlarged heart, and died of heart failure from his excited and combative state. This case gives rise to complex expert witness contests over theories of asphyxiation, theories of excited delirium and aggression, the significance of a broken hyoid bone, the significance of an enlarged heart, the effects of a Taser, the effects of a dog deployment, the effects of 1 to 2 baton strikes, the effects of marijuana use on cardiomyopathy conditions, the effects of marijuana use in paranoid schizophrenics, and the significance of multiple other clinical and pathological factors that could have caused or contributed to Mr. Yancy's death. (See Declaration of Douglas E. Baxter in Support of Defendants'

---

[1] Mr. Yancy was the father of Plaintiffs Alexis and Jayden Yancy and the son of Plaintiff Lawanda Moses.

1  Motion for (1) Authorization to Name a New Expert and (2) for Continuance of
2  Trial [hereafter "Baxter Decl."], pp. 2-3, ¶ 2; pp. 5-7, ¶¶ 9-24 & Exhs. A – O.)[2]

3        Both sides have designated expert witnesses to testify about their contending
4  theories of the specific cause or causes of Mr. Yancy's death. (Baxter Decl., pp. 2-
5  3, ¶ 2; p. 6, ¶¶ 10-12 & Exhs. A-C.) Unfortunately, defense counsel learned on
6  Friday, May 5, 2017, that Dr. Di Maio was in an intensive care unit at Cornell
7  Hospital because he had suffered a stroke while visiting New York. (Baxter Decl.,
8  p. 3, ¶ 3.) On Monday, May 8, 2015, defense counsel spoke to Dr. Di Maio's
9  daughter, Samantha Di Maio, on the telephone to obtain more information about
10 Dr. Di Maio's status. Samantha Di Maio confirmed that her father was still in the
11 hospital from a stroke and that his prognosis was unknown. She reported that the
12 family was contacting all attorneys on his pending expert witness cases to let them
13 know that Dr. Di Maio could no longer help with their cases. (Baxter Decl., p. 3, ¶
14 4.)

15       On Monday, May 8, 2015, defense counsel telephonically met and conferred
16 with Bill Bender and Dave Fox, counsel for the *Yancy* Plaintiffs. Defense counsel
17 explained that Dr. Di Maio was no longer available to be a defense expert and that
18 Defendants would need to seek court approval for naming a new forensic pathology
19 expert. Defense counsel also indicated that Defendants wanted to bring a motion
20 asking for continuance of the trial by 3 to 6 months to allow Defendants sufficient
21 time to locate a new expert, have the expert review and evaluate the extensive
22 materials in the case, review the existing expert witness reports, prepare his or her
23 own expert report, prepare for and undergo deposition, and prepare for and testify at
24 trial. (Baxter Decl., pp. 3-4, ¶ 5.)

25       Plaintiffs' counsel indicated that they were opposed to a request for trial
26 continuance of this length. They did indicate that they were amenable to a request

27     [2] All citations to Exhibits in this memorandum will be to the exhibits
28 attached to the Baxter Declaration.

3
MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME
NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

that Defendants had been planning to bring before receiving word of Dr. Di Maio's stroke. This was a planned request to ask the Court to continue the trial a week or two because of the unavailability of Defendant's police practices expert – Robert Fonzi – for the current trial setting of August 7, 2017. (Baxter Decl., p. 4, ¶ 3.)

On Wednesday, May 10, 2017, defense counsel spoke to Plaintiffs' counsel Bill Bender again about the proposed motion for the defense to designate a new expert and for continuance of the trial. Mr. Bender reported that the Plaintiffs would not oppose a continuance of the trial by 30 to 45 days. (Baxter Decl., p. 4, ¶ 6.)

As indicated in Mr. Baxter's Declaration, Defendants have a compelling need to retain a new forensic pathology expert who can review the extensive materials in this case, prepare opinions and an expert report, prepare for and submit to deposition, and prepare for and testify at trial. (Baxter Decl., pp. 2-3 ¶ 2; pp. 4-6, ¶¶ 7-9.) Defendants do not believe a 30 to 45-day continuance will be sufficient; rather, Defendants respectfully request a six-month continuance. (Baxter Decl., pp. 4-5, ¶¶ 7-8.) Defendants propose that the parties be allowed to appear before the Court either telephonically or in person to discuss the new date so that all parties can make sure that the new date is set at a time when the multiple expert witnesses can be available and when counsel are not in other trials.

## ARGUMENT

**I.  GOOD CAUSE EXISTS TO ALLOW DEFENDANTS TO NAME A NEW FORENSIC PATHOLOGY EXPERT**

The deadline for designating expert witnesses in this case was December 1, 2016. The deadline for designating rebuttal experts was December 22, 2016. (Doc. 69, p. 2, ¶ 1.) Defendants timely designated Dr. Di Maio as an expert on the forensic pathology issues on December 1, 2016. (Baxter Decl., p. 6, ¶ 10 & Ex. A.) Dr. Di Maio provided his initial report and a rebuttal report. (Baxter Decl., pp. 6-7, ¶¶ 13, 14, 17, & 18.) Just as the parties were in the process of deposing expert

witnesses, defense counsel was trying to get in touch with Dr. Di Maio to line up a date for his deposition and have him assist with questions for the deposition of Plaintiffs' forensic pathologist – Dr. Werner Spitz.  However, as noted above, defense counsel just learned that Dr. Di Maio is in intensive care in New York because he suffered a stroke while visiting New York.  Dr. Di Maio will no longer be able to serve as an expert witness in this case. (Baxter Decl., p. 3, ¶¶ 3-4.) Defendants have a compelling need for a forensic pathologist of Dr. Di Maio's caliber and specialty in this case, lest their theory of cause of death not be fairly and fully presented to the jury. (Baxter Decl., pp. 2-3, ¶ 2; pp. 4-6, ¶¶ 7-10.)  Therefore, Defendants respectfully ask the Court to exercise its statutory and inherent authority to grant them permission to search for, locate, and designate a new forensic pathology expert witness in this case.

     The Court has the authority to modify its scheduling order pursuant to Rule 16(b)(4) of the Federal Rules of Civil Procedure.  This provision provides:  "A schedule may be modified only for good cause and with the judge's consent."  In addition, Rule 6(b) of the Federal Rules of Civil Procedure provides in pertinent part:

> When an act may or must be done within a specified time, the court may, for good cause, extend the time:
>
> (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires[.]

In addition to these statutory sources of authority to modify the deadline for filing a motion to compel, the Court has the inherent power to control and manage its docket and the course of proceedings. *Southern California Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir. 2002) (citing *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992)).

     "Good cause" to modify a scheduling order exists if the deadline for which modification is sought cannot reasonably be met despite the moving party's diligence. *Noyes v. Kelly Services*, 488 F.3d 1163, 1174 n. 6 (9th Cir. 2007);

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

Here, Defendants did not fail to designate Dr. Di Maio or provide reports. The only issue is that Dr. Di Maio has become incapacitated because of a stroke. Under such circumstances, Defendants have good cause for moving for permission to locate and designate a new forensic pathology expert and to have that expert evaluate the case, prepare a report, submit to deposition, and testify at trial.

Plaintiffs may argue that Defendants do not need a retained forensic pathologist because Defendants designated Darryl J. Garber, M.D. as an expert. Dr. Garber was the forensic pathologist who performed the actual autopsy on Mr. Yancy. Defendants designated him as a non-retained expert because there was every belief that the parties would need to call the physician who did the actual autopsy to the stand at trial to testify about the autopsy and findings. Defendants wanted to preserve the right to ask Dr. Garber opinion questions in the event he is called as a witness on his autopsy findings; therefore, they designated him as a non-retained potential expert witness. However, defense counsel has never spoken to Dr. Garber and has no knowledge of what his full testimony will be. The parties simply know what Dr. Garber concluded in the autopsy report, but the defense has no way of predicting what Dr. Garber will say in relation to the details of the parties' experts' contending theories of the cause of death. While Dr. Garber's conclusions about the cause of death tend to corroborate Defendants' theory of causation, Defendants never indicated that they would rely solely on the autopsy report. Since no one knows at this time whether Dr. Garber will elaborate on his opinions in a manner that is more favorable to the Defendants or the Plaintiffs, it would be fundamentally unfair to conclude that Defendants do not need their own retained forensic pathology expert. In any event, Defendants cannot force Dr. Garber to review more evidence, read deposition transcripts, review opposing expert reports, or do any other work that Defendants would want a retained expert to perform in evaluating the Defendants' theories of the case.

Plaintiffs may also argue that Defendants do not need a forensic pathology expert because Defendant's emergency medicine expert – Gary Vilke, M.D. – will also provide medical testimony on cause of death issues. However, Dr. Di Maio is a forensic pathologist (see Exhibit N to Baxter Declaration). Defendants need a witness with his expertise to evaluate and opine about the anatomical, physiological, and toxicological evidence that pathologists are best trained to explain when evaluating cause of death. Dr. Vilke is an emergency medicine specialist who is familiar with the clinical presentation of alleged asphyxiation, excited delirium, Taser deployment, and other use-of-force and in-custody injuries and their relationship to in-custody deaths. Dr. Vilke does not perform autopsies. While there is some overlap in the opinions of the two experts on cause-of-death issues, they also provide unique insights from their different specialties that are necessary to fully present Defendants' contentions regarding the cause of death. The same will be the case with any new forensic pathology expert that Defendants retain.

If Plaintiffs argue at this point that Defendants do not need a forensic pathology expert because of the opinions of Dr. Vilke, they are effectively bringing a motion in limine to exclude forensic pathology testimony before the hypothetical new expert is deposed and given the opportunity to elaborate on his or her unique training and experience and his or her unique contributions to the understanding of cause of death. Indeed, Dr. Di Maio and Dr. Vilke have not even been deposed at the time this motion is being written, nor has Plaintiffs' forensic expert – Dr. Spitz. Review of Dr. Di Maio's reports and Dr. Vilke's reports do show some points of overlap, but they also show opinions and expertise that is unique to their respective specialties. (Compare Exs. D, E, H, and I to Baxter Declaration.)

The mere existence of some overlap among different medical experts is not grounds for exclusion of the experts *in toto*. *See Lawrey v. Kearney Clinic, P.C.*, No. 8:11-CV-63, 2012 WL 3871659, at *2 (D. Neb. Sept. 6, 2012) ("The Court

agrees that the risk of some overlap in the opinions of the Defendants' experts is not sufficient reason to limit the Defendants to the presentation of a single expert's testimony on issues of standard of care and causation. Even if the opinions expressed by Dr. Vilke and Dr. Di Maio (as a sample of what a potential new expert might say) some similarities or overlap, there are sufficient differences in both their backgrounds and their approaches that they would not just take the stand at the trial one after the other to say, "me too." In fact, "[t]estimony on the same topic by different experts . . . is not needlessly cumulative where the experts will testify from different professional perspectives." *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10- 21511-CIV, 2010 WL 4225947, at *2 (S.D. Fla. Oct. 21, 2010) (Court allows two experts to testify about causation and damages where one was a contractor and one was an engineer); see also *Rodriguez v. County of Stanislaus*, No. 1:08-CV-00856 OWW, 2010 WL 2720940, at *2 (E.D. Cal. July 8, 2010) (Court allows multiple experts finding each expert has "unique educational and employment backgrounds," and differing qualifications: "The [different] qualifications of these two experts alone is sufficient reason to permit the designation and testimony of each.") In addition, a Court found that "[t]he mere presence of overlap, reference to another expert's report or a similar conclusion, however, does not render an expert report unnecessarily 'cumulative' pursuant to FRE 403."); *Abbott Point of Care, Inc. v. Epocal, Inc.*, 868 F. Supp. 2d 1310, 1331-1332 (N.D. Ala. 2012) (Court allowed two chemical engineers to testify regarding whether purported infringing conduit walls contained air pockets because the experts "have different credentials, and they offer different perspectives on the infringement issue, even though they ultimately reach the same conclusion." One expert used a "materials-based analysis . . . derived from his industrial experience" and the other expert testified from a perspective of "fundamental principles of gas diffusion in liquids and solids.").

    Thus, even if Plaintiffs were addressing the issue on a motion in limine to

challenge Defendants' reliance on both Dr. Di Maio (if he were still available) and Dr. Vilke, the two experts should be allowed to provide their specialized opinions on cause-of-death issues. "While district judges have broad discretion to exclude expert witnesses, they may not do so 'arbitrarily, or on the basis of mere numbers.'" *Nalder v. West Park Hospital*, 254 F.3d 1168, 1173 (10th Cir. 2001*); see also Fox v. County of Tulare*, No. 1:11-cv-00520-AWI-SMS, 2013 WL 5670871, at *4 (E.D. Cal. Oct. 16, 2013), *quoting Green Const. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1014 (10th Cir.1993). Here, the argument against allowing Defendants to obtain a new forensic pathology expert is even weaker at this phase of the case, because none of Defendants' medical experts has had the opportunity in deposition to explain his unique specialty and the unique significance of his opinions in the wake of other experts' opinions.

Furthermore, Plaintiffs themselves are resorting to two medical experts to testify about cause of death issues. Dr. Spitz is a forensic pathologist. (Ex. L.) Dr. Boehme is more than just a biomechanics expert. He is a practicing Medical Doctor who also has an engineering background. (Ex. M.) Much of his experience and training comes from his years serving as an emergency room physician. (Ex. M.) He is not limiting his opinions to the alleged force applied to Mr. Yancy's neck that allegedly caused a fractured hyoid bone and asphyxiation. Rather, he applies his medical expertise in his rebuttal report to opine on all of the key medical opinions offered by Dr. Vilke and Dr. Di Maio in their initial reports.[3] (Ex. K.)

---

[3] Dr. Boehme has not been designated as a rebuttal expert. (Ex. C.) Plaintiffs did designate an emergency medicine specialist (Raymond L Ricci, M.D., P.C.) as a rebuttal expert, but Defendants have not located any reports from Dr. Ricci. It appears that Plaintiffs have elected not to proceed with Dr. Ricci. Since Dr. Boehme has not been designated as a rebuttal expert, it follows that Plaintiffs are using Dr. Boehme both for the issue of biomechanics (i.e., the alleged force causing a fractured hyoid bone) and for the presentation of evidence that clearly depends on expertise as a Medical Doctor. Notably, as shown below, Dr. Boehme offers medical analysis to challenge opinions given by Dr. Vilke and Dr. Di Maio.

9
MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

To be sure, Dr. Boehme provides three single-spaced pages of medical opinions to challenge Dr. Vilke's opinions on whether the restraining process caused cardiac arrest, whether the Taser deployment contributed to the death, whether there is clinical evidence of a asphyxiation, whether the broken hyoid bone caused or contributed to Mr. Yancy's death, whether the dog bite contributed to Mr. Yancy's death, whether the baton strike contributed to Mr. Yancy's death, whether Mr. Yancy was exhibiting signs and symptoms consisted with Excited Delirium Syndrome, whether Mr. Yancy's enlarged heart placed him at significant risk of cardiac arrest, and whether the time to initiate CPR was appropriate and whether it caused or contributed to Mr. Yancy's death. (Ex. K.)

A few quotations from Dr. Boehme's opinions will show that he is offering medical opinions on multiple cause-of-death issues, despite the fact that Plaintiffs also have a forensic pathology expert. Dr. Boehme relies on his medical training and to his interpretation of matters found at autopsy. For instance, Dr. Boehme quotes one of Dr. Vilke's points and then opines as follows:

> "The restraining process did not cause the sudden cardiac arrest and death in Mr. Yancy." This is false. Mr. Yancy became unresponsive during the restraining process and the officers initiated CPR efforts and called for EMS support. EMS personnel never regained a pulse on Mr. Yancy. Saying that the restraining process did not cause the sudden cardiac arrest and death is to imply that Mr. Yancy would have suffered a sudden cardiac arrest and death on the same date and time independent of the restraining process. There is absolutely no medical evidence for this occurring. Mr. Yancy's hypertrophic cardiomyopathy was an incidental finding found at autopsy. There is no evidence in the medical records that Mr. Yancy suffered any condition or complication from an "enlarged heart" nor was he treated for any condition or complication due to an enlarged heart.

(Ex. K, p. 1.)

In challenging Dr. Vilke's opinion that the Taser deployment did not cause or contribute to Mr. Yancy's death, Dr. Boehme opines: "The use of the TASER ECD did not directly cause Mr. Yancy's death. However, the use of this device on Mr. Yancy contributed to his development of a 'state of exhaustion' during his struggle with the police officers." (Ex. K, p. 1.)

Further delving into the realm of physician opinion and beyond biomechanics, Dr. Boehme challenges Dr. Vilke's opinions that there is no clinical evidence of a mechanical hold on Mr. Yancy and that the isolated hyoid fracture noted on autopsy did not cause or contribute to Mr. Yancy's cardiac arrest and death. After citing what he claims is video and witness evidence of an officer compressing Mr. Yancy's neck with the officers' knee, Dr. Boehme provides the following medical refutation to Dr. Vilke's opinions:

> "Putting enough pressure on a person's neck to fracture their hyoid bone while putting pressure upon their back while that person is lying prone on the ground certainly compromises that individual's ability to breathe thereby placing the person in a situation where their body would elicit a "fight-or-flight" response. This "fight-or-flight" response (also called the hyperarousal response or acute stress response) is a physiological reaction that occurs in response to a perceived harmful event, attack, or threat to survival. The reaction begins in the amygdala which triggers a neural response in the hypothalamus followed by activation of the pituitary gland secreting ACTH and epinephrine and norepinephrine from the adrenal gland. ACTH leads to cortisol secretion which increases blood pressure and blood glucose (among other things) and the increase in catecholamines leads to increased breathing and respiratory rate (among other things). This increase in circulating catecholamines would be significant given this situation of impending asphyxia and also lead to a "state of exhaustion". Also, the presence of some bleeding around the fractured hyoid bone indicates that the hyoid bone fracture occurred before death.

(Ex. K, pp. 1-2.)

In challenging Dr. Vilke's opinion that the dog bite did not cause or contribute to Mr. Yancy's death, Dr. Boehme states that the dog "attacked" Mr. Yancy and that this caused a "fight-or-flight" response. Dr. Boehme opines that this increased the circulating catecholamines and acidosis in Mr. Yancy's body, thereby contributing to a "state of exhaustion." (Ex. K, p. 2.) Dr. Boehme opines that the same result followed from the baton strike. Dr. Boehme even opines that, after the initial struggle (which involved the dog bite, Taser deployment, baton strike, and first takedown), Mr. Yancy "clearly appeared to be medically stable with no evidence of impending demise." Dr. Boehme based this on his review of a video. (Ex. K, p. 2.)

On page 2 of his rebuttal report (Ex. K), Dr. Boehme provides a detailed critique of Dr. Vilke's excited delirium theories. Dr. Boehme first states that it is a controversial diagnosis that is not found in either the DSM-5 or the ICD (International Statistical Classification of Diseases and Related Health Problems.) Dr. Boehme explains the ICD and the DSM-5. He notes that excited delirium has been accepted by the National Association of Medical Examiners and the American College of Emergency Physicians. Dr. Boehme then discusses the epidemiology of excited delirium. He then challenges the application of the diagnosis to Mr. Yancy, because Mr. Yancy was not found to be on psycho-stimulant drugs or suffering alcohol withdrawal. Dr. Boehme notes that the only relevant factor in Mr. Yancy is the diagnosis of a mental illness. However, Dr. Boehme opines that there was no sign of delirium, because Mr. Yancy was "responding normally to the situation." Dr. Boehme notes that anti-psychotic medications are also associated with excited delirium. He then implies that, because Mr. Yancy was not on his anti-psychotic medication, it is less likely that he was going through excited delirium.[4]

Dr. Boehme next discusses the clinical factors that indicate the likelihood of restraint or positional asphyxia versus excited delirium:

---

[4] Dr. Boehme's interpretation of the significance of a paranoid schizophrenic patient's failure to take his anti-psychotic medications is just one of many telling illustrations of Defendants' need for medical experts of different specialties. Dr. Vilke explained that stopping psychiatric medications and having untreated schizophrenia is one of the classic causes of excited delirium syndrome. (Ex. E, p. 14.) Thus, the two emergency medicine specialists have diametrically opposed opinions on this issues, as with most issues. At the same time, Dr. Di Maio, as a pathologist, was prepared to testify about the toxicological significance of a schizophrenic failing to take his anti-psychotic medication. Dr. Di Maio cited the metabolic disturbances that occur in schizophrenics and the heightened propensity for acute psychosis due to failure to take medications. (Ex. D. p. 7.) Likewise, Dr. Di Maio gave his professional opinion that marijuana use can also exacerbate acute psychosis in schizophrenics. By contrast, Dr. Spitz provides only conclusory opinions about the insignificance of mental illness and marijuana use in evaluating Mr. Yancy's death. (See Ex. F, p. 5 & Ex. J, p. 4.) Dr. Boehme elaborates on the insignificance of marijuana use by opinion it "typically depresses the central nervous system." (Ex. K, p. 3.) Thus, if Plaintiffs contend that it is sufficient for Defendants to simply have Dr. Vilke testify about medical issues from the standpoint of his emergency medicine background, Plaintiffs are not applying the same rule to their own case.

> Risk factors for Restraint Asphyxia include prolonged restraint, obesity, cardiac or respiratory problems, and illicit drug use such as cocaine, AND kneeling or otherwise placing weight on the subject. Mr. Yancy was subjected to a prolonged restraint where officers placed their weight upon him minimizing chest expansion and his neck thereby fracturing his hyoid bone. Other than the use of marijuana (which typically depresses the central nervous system), there was no evidence that Mr. Yancy was taking any "stimulant" drugs either prescribed or illicitly used at the time of his altercation with the police officers and his death. Mr. Yancy was nearing exhaustion (see above) during his prolonged altercation with the police officers thereby increasing his risk for asphyxiation by reducing the time it would take to be asphyxiated. The cause of death was asphyxia.

(Ex. K, p. 3.)

Next, Dr. Boehme provides cardiology opinions in responding to Dr. Vilke's contention that Mr. Yancy had an enlarged heart that placed him at risk of cardiac failure and death:

> Mr. Yancy's cardiac condition was only make known through autopsy. There was no evidence in the medical records that Mr. Yancy suffered from any condition or complications from an "enlarged heart" nor was he treated for any condition or complications from an "enlarged heart". Mr. Yancy was performing his activities of daily living prior to the altercation with the police officers showing no signs of a heart condition.

(Ex. K, p. 3.)

Dr. Boehme also applies his physician experience and training to challenge opinions provided by Dr. Di Maio. For instance, Dr. Boehme states the following in contesting Dr. Di Maio's opinions that Mr. Yancy's death was caused by a "fatal cardiac arrhythmia secondary to hyperadrenergic state" and that "the hyperadreneregic state was due to acute schizophrenic psychosis as well as adrenergic complications of chronic schizophrenia and the physiological effects of the struggle":

> Dr. Di Maio certainly includes the struggle as a source of the hyperadrenergic state but he implies that Mr. Yancy's mental illness played the major role in the development of the hyperadrenergic state leading to Mr. Yancy's fatal arrhythmia. Mr. Yancy had a long history of mental illness which he lived with without any clinical evidence of cardiac disease and his cardiac disease was only made evidence upon autopsy after a strenuous physical struggle in which he was attacked by a police dog, tased twice, was subjected to pressure being applied to his torso and neck and resulting in a fractured hyoid bone. People with

13
MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))

> schizophrenia are typically reserved and self isolated, and only appear to exert themselves physically when agitated. Mr. Yancy's asphyxiation was the cause of his death. Mr. Yancy was seemingly fine after the dog attack, taser attack, baton strikes, and take down and only dies after he was asphyxiated (see above).

(Ex. K, p. 3.)

Dr. Boehme also challenges Dr. Di Maio's opinions about the time it takes for a person to go unconscious due to asphyxia. He also tries to counter Dr. Di Maio's opinions regarding the significance of Mr. Yancy's marijuana use on the day of the incident. Dr. Boehme states: "Marijuana does not make one hyper-excitable or induce a hyperadrenergic state on someone. In fact, it has the opposite effect and is used medicinally for patients with chronic intractable pain syndromes. Marijuana did not play a role in Mr. Yancy's demise." (Ex. K, p. 4.)

Therefore, Plaintiffs are using two separate experts (a forensic pathologist and a physician) to provide medical opinions about cause-of-death issues. It would be disingenuous to argue that Defendants should be limited to Dr. Vilke's testimony and not have the benefit of a forensic pathologist to explain (from the perspective of a Medical Examiner) the complicated cause-of-death issues in this case. There is a compelling need for Defendants to obtain a new forensic pathology expert in this case.

**II. GOOD CAUSE EXISTS TO CONTINUE THE TRIAL BY SIX MONTHS TO ALLOW DEFENDANTS TO LOCATE AND NAME A NEW FORENSIC PATHOLOGY EXPERT AND HAVE THAT EXPERT CONDUCT THE EXTENSIVE WORK NECESSARY TO PREPARE OPINIONS AND REPORTS, SUBMIT TO DEPOSITION, AND PREPARE FOR AND TESTIFY AT TRIAL**

The Court has the authority to modify its scheduling order pursuant to Rule 16(b)(4) of the Federal Rules of Civil Procedure. This provision provides: "A schedule may be modified only for good cause and with the judge's consent." In addition, the Court has the inherent power to control and manage its docket and the course of proceedings. *Southern California Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir. 2002) (citing *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992)). "Good cause" to modify a scheduling order exists if the deadline for which

modification is sought cannot reasonably be met despite the moving party's diligence. *Noyes v. Kelly Services*, 488 F.3d 1163, 1174 n. 6 (9th Cir. 2007); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). The good cause standard applies to a motion to continue a trial date set by a scheduling order. (*See Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 218 F.R.D. 667, 671 (C.D. Cal. 2003).

For all the reasons stated above regarding the need for a new expert witness, there is good cause for continuing the trial in the instant case. Defendants have acted with diligence in bringing before the Court the loss of their forensic pathology expert. This motion is necessary to prevent severe prejudice to the Defendants, in that the loss of this expert witness prevents them from fairly and fully presenting their theory of the crucial cause-of-death issues. These issues are central to the question of whether the officers engaged in excessive force.

Defendants seek a six-month continuance of trial because of the time it will take to find a new expert and the need to provide that expert with sufficient time to review the extensive evidentiary and discovery materials, prepare opinions, prepare expert reports, submit to deposition, and prepare for and testify at trial. (Baxter Decl., pp. 4-5, ¶¶ 7-8.) To continue the trial by only 30 to 45 days will severely limit the Defendant's ability to find a qualified expert in this field, as such experts are typically already committed to multiple other forensic cases that will prevent them from allocating sufficient time to properly evaluate all the extensive materials, prepare reports, and appear for deposition and trial that is set only a few months from their retention. In addition, it is highly likely that the new expert will have insights on the case that will require Plaintiff's experts to issue new rebuttal reports and possibly even warrant requests for supplemental depositions of such experts. To the extent that there is any potential for settlement, Defendants need to be able to evaluate the issue with full knowledge of their available expert evidence on the crucial cause-of-death issues. The parties would be better served by making those

determinations well before the eve of trial, rather than after making the final substantial expenditures and labor allocations for final trial preparation.

## CONCLUSION

Accordingly, Defendants respectfully ask for authorization to locate and name a new forensic pathology expert witness. Defendants are requesting 90 days to locate and designate the new forensic pathology expert. Defendants are then requesting that this expert's initial written report be due within 60 days of the date the expert is designated. Defendants request that any rebuttal reports that Plaintiffs will submit in response to the new expert's report be due within 30 days of service of the new expert's report. Defendants further request that the trial be continued by a period of six months from the current trial date of August 7, 2017.

Defendants propose that the parties be allowed to appear (either telephonically or in person) at either the hearing of this motion or a special status conference to provide all information necessary to ensure that any new trial date is set at a time when all expert witnesses are available and counsel are not in other trials. For example, Defendants already intended to raise the issue of a brief trial continuance because their police practices expert – Robert Fonzi – has a scheduling conflict for the current trial date. Now that the loss of Dr. Di Maio as an expert warrants a much longer continuance, Defendants believe that it would be best for all parties to appear before the Court to discuss the potential new date so that it is not set on a date that creates expert witness or counsel unavailability.

///
///
///
///
///
///
///

| | | |
|---|---|---|
| 1 | Dated: May 12, 2017 | Respectfully Submitted, |
| 2 | | XAVIER BECERRA<br>Attorney General of California |
| 3 | | RICHARD F. WOLFE<br>Supervising Deputy Attorney General |

*s/ Douglas E. Baxter*
DOUGLAS E. BAXTER
Deputy Attorney General
*Attorneys for Defendants State of California (by and through the California Highway Patrol); Gilbert Caldera; Heraclio Cardenas; Robert Gonzales; Fernando Alvarez; Salvador Acevedo; and Wesley Boerner*

SD2015700805
81686954.doc

17
MEMORANDUM IN SUPPORT OF DEFS.' MOTION FOR AUTHORIZATION TO NAME NEW EXPERT AND FOR CONTINUANCE OF TRIAL (15-cv-0580 JM (PCL))