

**VINCENT J.M. DI MAIO, M.D.**
CONSULTANT IN FORENSIC PATHOLOGY
10 CARRIAGE HILLS
SAN ANTONIO, TEXAS 78257
(210) 698-1400
Email: vincent_dimaio@yahoo.com

February 21, 2017

Douglas E. Baxter
Deputy Attorney General
Dept. of Justice – State of California
600 West Broadway – Suite 1800
San Diego, CA 92186-5266

Re: Yancy et al v State of California et al.

Dear Mr. Baxter:

As requested, I have reviewed the following materials in regard to the above case:

1. El Centro Personnel Photos
2. Photos of Boudreaux
3. Audio recordings of interviews
4. CIIT Reports with redactions
5. TASER$^R$ Log
6. Plaintiff's Second Amended
7. Complaint Answers by Defendants
8. Initial Disclosures by Defendants
9. Responses by Defendants – City of Imperial
10. Reponses by Defendants to Plaintiffs' Special Interrogatories
11. Tommy Yancy's Military Records
12. Tommy Yancy's VA Medical Records
13. Responses by Defendants Caldera; Cardenas and Gonzales
14. Responses by Defendant State of California
15. Depositions;    Salvador Acevedo, Jr.
                    Fernando Alvarez
                    Mario D. Luna

1

Richard Kotzin
Jose Luis Flores
Vivian Flores

At approximately 1322 hours on Sunday May 11, 2014, CHP Officer G. Caldera was on duty as a canine handler. He was wearing a blue CHP utility uniform and driving a marked, black-and-white CHP patrol vehicle, transporting his dog "Jambo." The weather was warm, dry, sunny, and clear, with moderately-strong wind gusts. He was driving his patrol vehicle south on State Route 86 when he observed a white Chrysler 300 sedan approaching him in the opposite direction. The Chrysler did not have a front license plate. He made a U-turn and activated his patrol vehicle's emergency lights. The driver of the Chrysler, later identified as Mr. Tommy Yancy, made a right turn onto 15th Street and came to a stop along the south curb.

Officer Caldera stopped his patrol vehicle, directly behind the Chrysler, and exited the patrol vehicle. He approached the Chrysler and contacted Mr. Yancy at his open window. Officer Caldera detected the strong odor of fresh marijuana emanating from within the vehicle. When asked by Mr. Yancy why he had been stopped, Officer Caldera explained the reason for the stop. Mr. Yancy then became agitated, argumentative, paranoid, and profane. Officer Caldera requested Mr. Yancy's driver license, vehicle registration, and proof of insurance which were provided. Mr. Yancy continued to be argumentative, but eventually calmed down.

At approximately 1322 hrs, due to the odor of marijuana within the vehicle and Mr. Yancy's agitated demeanor, Officer Caldera used his CHP radio to request backup by an additional officer. CHP Officer H. Cardenas arrived at approximately 1324 hours and parked behind Officer Caldera's patrol vehicle. Officer Caldera advised Officer Cardena that Mr. Yancy was agitated and acting inappropriately and that he intended to have Mr. Yancy exit his vehicle in order to evaluate the latter's sobriety and to conduct a search of the vehicle for drugs.

Officer Caldera approached the Chrysler, with Officer Cardenas following just behind him. He contacted Mr. Yancy at his partially-open, left, front window. Officer Caldera asked Mr. Yancy to unlock the door, and he complied. Officer Caldera requested Mr. Yancy to exit the vehicle. Mr. Yancy refused and again became agitated and profane. He dared Officer Caldera to forcibly remove him from the vehicle. Officer Caldera informed Mr. Yancy that he was going to remove him from the vehicle and opened the door. Mr. Yancy exclaimed, "You want to fucking get me, come fucking get me!" As Officer Caldera reached for Mr. Yancy's left wrist, Mr. Yancy attempted to kick Officer Caldera with his left foot. He missed and instead struck the driver's door. In an effort to prevent further assault, Officer Caldera attempted to close the door, however, Mr. Yancy kicked the door back open and hit Officer Caldera in the right shoulder and arm with his right fist. A struggle between the officers and Mr. Yancy ensued.

2

At approximately 1326 hours, Officer Caldera broadcast a request for backup assistance over the CHP radio. Eleven offices from CHP (6), Imperial Police Department (IPD-3), and El Centro Police Department (ECPD - 2) responded to the request for assistance.

Having been assaulted by Mr. Yancy, and fearing for his safety and that of Officer Cardenas, and considering Mr. Yancy's large size, aggressive demeanor, and likely drug influence, Officer Caldera tried to release his departmental dog, Jambo, using his remote kennel door release. As he stepped back from Mr. Yancy, he realized the remote door release had malfunctioned, and Jambo was still secured within his kennel. Mr. Yancy exited the Chrysler and stood near his open left-front door. He appeared to be in a "berserk rage", verbally challenging the officers to fight with him and threatening to inflict great bodily injury on them.

Officer Caldera ran to his patrol vehicle and manually removed Jambo. Officer Caldera repeatedly informed Mr. Yancy he was under arrest, and the dog would be deployed if he did not lie on the ground immediately. Mr. Yancy refused and verbally dared Officer Caldera to deploy the dog, promising he would cause it great bodily injury. Officer Caldera deployed Jambo, who clamped down on Mr. Yancy's left forearm. Yancy showed no reaction to the dog bite. Mr. Yancy then quickly grabbed Jambo in a choke hold, wrapping his left arm around his neck, and repeatedly struck him in the head and body with his right fist.

Officer Caldera attempted to physically restrain Mr. Yancy and pull him to the ground. Mr. Yancy continued to refuse Officer Caldera's orders to lie on the ground. Mr. Yancy attempted to strike Officer Caldera again with his right fist, but missed.

Officer Cardenas attempted to strike Mr. Yancy twice in the right-rear thigh with his collapsible "ASP" baton. Mr. Yancy did not react to the blows. Officer Cardenas deployed a TASER$^R$ at Mr. Yancy, embedding two darts in Mr. Yancy's back and delivering a five-second electrical charge. Mr. Yancy did not react. Officer Caldera became entangled within the dart wires and inadvertently received an electric shock. Mr. Yancy choked Jambo into unconsciousness.

Officer Caldera felt that Mr. Yancy was in a drug induced berserk rage and impervious to pain.

Officer Gonzales arrived on the scene at 1327 hours. He observed Yancy on his left side on the ground. Officer Cardenas was standing near Yancy with a Taser$^R$ in his hand. Officer Caldera was lying on the ground next to Jambo. Yancy had finally released Jambo who was unconscious and convulsing. The dog slowly regained consciousness and was walked to the police vehicle by Caldera. Yancy stopped resisting but continued verbally challenging and taunting the Officers. He had still not been handcuffed

3

EXHIBIT D at p. 3

Mr. Yancy slowly complied with Officer Gonzales's commands to roll over into a prone position and place his hands behind his back. Officer Gonzales knelt to Yancy's right, placed his right knee to the lower back and grabbed his left wrist. He placed a cuff on the left wrist and Officer Caldera put a cuff on the right wrist. Due to Mr. Yancy's large size and his refusal to move his wrists into proper handcuffing position, two handcuffs were used, in a daisy-chain configuration. Officer Gonzales stood up and advised his CHP radio dispatcher that the situation was "Code 4." Time was approximately 1327. He requested a paramedic response to treat Mr. Yancy's injuries. Sergeant Kotzin arrived on the scene, and Officer Gonzales walked away from Mr. Yancy toward a patrol vehicle.

As Officers Alvarez and Acevedo arrived on scene, Officer Caldera was walking Mr. Yancy to a patrol vehicle. Approximately halfway between Mr. Yancy's vehicle and the patrol vehicles, Mr. Yancy began kicking toward Officer Caldera, causing him to lose control of Mr. Yancy. Officer Caldera reached across Mr. Yancy's upper-torso and forced him to the ground. Yancy was prone with his hands cuffed behind his back. Officer Alvarez exited his patrol vehicle and ran to assist. Officer Gonzales was also running to that location. Officer Gonzales was initially positioned near Mr. Yancy's upper body, but eventually repositioned himself near Mr. Yancy's legs. Officer Gonzales attempted to restrain the legs.

As the Officers attempted to restrain Mr. Yancy on the pavement, he kicked violently with his feet. Sergeant Kotzin used his left foot to step on Mr. Yancy's lower-left leg, just above the ankle, to pin it against the pavement. After 15 to 25 seconds, other CHP officers gained control of Mr. Yancy's legs, so Sergeant Kotzin backed away.

During the struggle, Officer Gonzales struck Mr. Yancy twice in the thigh with his fist. Officer Cardenas unsuccessfully attempted to deploy his TASER$^R$ in the "drive stun" mode, against Mr. Yancy's back. Officer Cardenas inadvertently pulled the trigger, rather than depressing the drive stun button. Consequently, the second cartridge fired but the darts were not properly expelled from the cartridge, due to the blast door being in direct contact with Mr. Yancy's back.

Mr. Yancy subsequently kicked Officer Gonzales away from him with his feet. Sergeants Kotzin and Luna, as well as Officers Acevedo and Alvarez, arrived before this second struggle ended and helped restrain Mr. Yancy in a prone position. Mr. Yancy thrashed about and kicked his feet, as he struggled to break from the Officers. Sergeant Kotzin and Officer Alvarez generally maintained standby roles, externally monitoring the situation and ready to assist if needed, but usually not actively engaging in the struggle.

Officer Caldera ended up kneeling beside Mr. Yancy, attempting to restrain him by pushing on Mr. Yancy's "left arm or shoulder" area. Caldera restrained the left arm pinning it to the ground.. Officer Acevedo took a position in front of his head facing it. He used his hands to

4

restrain Mr. Yancy's upper torso against the ground by pushing down on Mr. Yancy's shoulders with his hands. Officer Acevedo told Mr. Yancy to "stay down." Mr. Yancy replied, "Okay, okay;" however, he repeatedly bucked his torso upward. Mr. Yancy's lower legs were bent upward at the knees. Officer Alvarez grasped one of Mr. Yancy's ankles, crossed it over the other ankle, and applied forward pressure, pinning the ankles together. The Officers continued restraining Mr. Yancy against the pavement, while Officer Gonzales attempted to retrieve a set of leg restraints from a patrol vehicle. Before the leg restraints could be applied, Mr. Yancy suddenly became unresponsive and stopped breathing and fighting. The time was approximately 1332 hours (Physical Evidence Analysis: Item 13:Digitalvideo-Disc J; INCIDENT SEQUENCE: At-Incident: Discussion, page 126). The officers rolled him onto his back and determined that he was not breathing and had no pulse.

At approximately 1334 hours (INCIDENT SEQUENCE: At-Incident:Discussion page 126), after obtaining medical supplies, Officers Caldera, Acevedo, and Gonzales began administering CPR to Mr. Yancy. CPR continued until the Officers were relieved by paramedics from the Imperial County Fire Department and Gold Cross Ambulance Service (see MVARS recording from Officer Gonzales's patrol vehicle). EMS had been dispatched at 1329 hrs (EMS time). They arrived at the scene at 1335 hrs making patient contact at 1336 hrs. On arrival, Mr. Yancy was unresponsive and pulseless. He was determined to be in asystole at 1337 hrs. The EMS personnel continued CPR administering three doses of epinephrine. He remained in asystole during therapy. He was transported to El Centro Regional Medical Center at 1349 hrs. On arrival at 1356 hrs, he was initially in Pulseless Electrical Activity. Mr. Yancy was pronounced dead at 1456 hours.

During the fighting Mr. Yancy presented unusual strength and was apparently imperviousness to pain. Mr. Yancy was struck approximately twice with a collapsible "ASP" baton and TASER$^R$ darts were fired into him on one occasion. In all instances, there was no apparent effect. A presentation such as this usually means that the individual is in either a drug induced psychosis or an intrinsic mental disease psychosis.

Jambo was a four-year-old, black and tan Belgian Malinois police service dog. He weighed 77 pounds. Following the fight with Mr. Yancy, Officer Caldera transported Jambo to the VCA Valley Animal Medical Center, in Indio, California, for examination and treatment. Upon examining Jambo, the DVM, did not observe any obvious signs of trauma. She prescribed an anti-inflammatory medication to prevent potential swelling of Jambo's throat. On Tuesday, September 9, 2014, Officer Caldera noticed Jambo was having difficulty breathing during a training exercise. He transported Jambo to Community Veterinary Hospital for evaluation. A DVM performed an endoscopic examination and discovered Jambo was suffering from laryngeal paralysis. He felt that this condition most likely resulted from Mr. Yancy's assault. Dr. Grant

5

further opined this condition would most likely necessitate permanent retirement of Jambo from service.

Past history revealed that Mr. Yancy was being treated at Veterans Affairs (VA) medical facilities in San Diego and Loma Linda. In July 2008, VA psychiatrists diagnosed him as having chronic, paranoid schizophrenia. Mr. Yancy self-committed himself to VA facilities, for treatment of his schizophrenia several times during 2008 and 2009. He frequently presented with a "delusional and paranoid persecution complex." Mr. Yancy claimed frequent auditory hallucinations, in the form of voices telling him to kill himself, leading to a diagnosis of chronic suicidal ideation. He was prescribed antipsychotic medications, which helped but he often did not take his medications. This resulted in the return of his symptoms. Mr. Yancy's psychiatrists repeatedly told him to abstain from alcohol and cannabis which would exacerbate the symptoms of his schizophrenia. Unfortunately, he did not always obey these instructions.

VA psychiatrists also diagnosed Mr. Yancy as suffering from post-traumatic stress disorder (PTSD) that caused him to be irritated, paranoid, and depressed. Mr. Yancy was never involved in combat or any life-threatening situation. In addition to the aforementioned entities, he had hypertension.

An autopsy was performed on 5/13/2014. Tommy Yancy was an obese 32 year-old black male 71 inches tall and weighing 280 lbs. There were two handcuffs on the left wrist attached to each other. There were no petechiae of the eyes. There were a number of minor abrasions, contusions and lacerations of the body involving the head, trunk and extremities none of which caused or contributed to the death. Seven punctate and elongated abrasions were on the left forearm. These were felt to possibly represent canine teeth marks. None appeared to have perforated the skin. There were two TASER$^R$ leads in the middle of the back.

There was a fracture of the left cornu of the hyoid with associated hemorrhage. There was no evidence of external trauma to the neck. The heart was enlarged weighing 490 g. Normal range of heart weight for adult males (95% inclusion) is 233 to 383 g. The left ventricle was hypertrophied measuring 24 mm. Enlargement was attributed to Hypertrophic Cardiomyopathy.

Blood alcohol was negative. Cannabinoids were detected. Delta -9-THC was 0.0069 mg/L; 11 hydroxy Delta 9 THC was negative and carboxy – Delta 9 THC was 0.054 mg/L. Based on the level of Delta 9 THC, Mr. Yancy was intoxicated, i.e. driving under the influence of marijuana. 0.0069 mg/L can be expressed as 6.9 ng/mL. In Europe, intoxication levels in Germany are 0.5 ng/ml; Switzerland 1.5 ng/ml and Belgium 1ng/ml. The level suggested in the United States is 5 ng/ml.

Marijuana use has also been associated with vascular conditions that increase

6

the risks of myocardial infarction, stroke, and transient ischemic attacks during marijuana intoxication. The actual mechanisms underlying the effects of marijuana on the cardiovascular and cerebrovascular systems are complex and not fully understood.

Aripiprazole was negative. It is used for the treatment of schizophrenia.

Whenever one gets excited, such as during a psychotic episode, or engages in strenuous activity such as a struggle, there is activation of the Sympathetic Nervous System with release of norepinephrine (NE) from nerve cells into the synaptic spaces between the Sympathetic neurons and receptors in organs such as heart muscle and the coronary arteries. In addition, there is release of epinephrine (E) and nor-epinephrine (NE) from the adrenal glands into the blood. The NE from the nerve fibers plus NE and E from the adrenals act on *beta$_1$* receptors in the heart causing an increase in heart rate, and force of contraction. As a consequence of this, the heart muscle needs additional oxygen. At the same time, NE and E act on the *alpha$_1$* receptors of the coronary arteries causing constriction of the arteries with reduction of blood flow, and thus, oxygen to the myocardium. Peak levels of catecholamines (norepinephrine and epinephrine) are reached not during the physical activity but in the 2-5 minutes after cessation of the activity and may reach 10x base levels. This is Dimsdale et al.'s "period of peril", when the heart is most sensitive to development of fatal arrhythmias. While the usual result of these physiological changes is uneventful with a complete return to normal, in some individuals, as in this case, death can occur. This may be due in part to a genetic predisposition.

During physical activity, blood potassium increases. Elevated levels of catecholamines in the blood neutralize the arrhythmogenic potential of the elevated blood potassium. During the "period of peril", the blood potassium levels drop dramatically, at times to hypokalemic levels. Hypokalemia, like hyperkalemia, is arrhythmogenic, but its' effects are not protected by elevated blood catecholamine levels. Hypokalemia predisposes to prolongation of the QT-interval, development of *torsade de pointes* and sudden cardiac death.

Individuals with schizophrenia quite frequently experience episodes of acute psychosis such as in this case. This can be due to failure to take medications such as in this case; use of drugs of abuse, e.g. marijuana, as in this case and perceptions of a hostile environment or a perceived provocation. In schizophrenia, there is a disturbance in the metabolism of norepinephrine (NE) both in the brain and peripherally. Numerous studies in both medicated and non-medicated patients with schizophrenia have found elevated NE concentrations in samples obtained from plasma, cerebrospinal fluid and postmortem brain. In addition, stress in individuals with schizophrenia results in higher blood levels of NE than in normal individuals.

Catecholamines (nor-epinephrine and epinephrine) can produce direct injury to cardiac muscle fibers. This is seen in patients with pheochromocytomas which produce toxic level of

7

EXHIBIT D at p. 7

catecholamines. The lesion present is called coagulative myocytolysis. It is characterized by myofibrillar damage and anomalous irregular cross-band formations. Other terms used for this lesion are myofibrillar degeneration and contraction band necrosis. This injury appears to be due to a combination of hypoxia due to coronary artery vasoconstriction and microvascular occlusion; free radial production due to metabolism of epinephrine and excessive catecholamine stimulation of Beta-receptors resulting in intracellular calcium-overload and ATP depletion from calcium dependent phosphatases.

It has been contended by some individuals that placing an individual in a prone position restricts respiration and that, combined with restraint, can result in hypoxia and death. In fact, testing has demonstrated no difference in pulmonary functions whether the individual is prone or supine. Even after heavy exercise, the prone position has no effect upon the oxygen or carbon dioxide levels in the blood. In both positions, there is no significant interference with respiration with respiratory values remaining in the normal range. While it is clear from experimentation that increasingly forceful restraint procedures do have an impact upon spirometric indices, it is also clear, that no physiologically important effect has been demonstrated upon gas exchange, oxygen levels in the blood, or carbon dioxide levels in the blood. All are within normal range.

As to pressure applied on the back, weights up to 102.3 kilograms (225 lbs) have been placed on the back of individuals restrained prone with no clinically significant impairment in respiration, decrease in oxygenation of the blood or increased carbon dioxide. In interrogations and deaths from pressing *(Peine forte et dure i.e.* "hard and forceful punishment"), judicial records recorded the weight used for pressing and the real-time endured. The usual practice was to place an individual on a table, place a second table on them and then add lead and/or stone weights. At times, the weights were placed on the bare chest. Records reveal individuals enduring weights of up to 376-400 lbs for 30-63 minutes and surviving. Reported deaths occurred at 625-704 lbs with survival of up to 15 minutes.

The presentation of this death is not one of chronic asphyxia with increasing air hunger such as one would see in positional asphyxia. Asphyxia involves the progressive process of oxygen deprivation of the vital organs. The brain is the organ most sensitive to deprivation of oxygen and thus individuals who have asphyxia will lose consciousness as the first gross manifestation of hypoxia (low blood oxygen) about two (2) minutes after the complete cessation of breathing. If someone can breathe in a reduced fashion, the period of time to unconsciousness is considerably longer. Cardiac arrest follows a number of minutes after this. There is no evidence that Mr. Yancy had any symptoms of severe, progressing air hunger. What happened was that he suddenly became unresponsive and was in cardiac arrest. This is the presentation of a cardiac mechanism of death not a pulmonary one.

Enlargement of the heart such as was present in this case, predispose to development of fatal cardiac arrhythmias. The etiology of the cardiac hypertrophy was attributed to Hypertrophic Cardiomyopathy (HCM) presumably due to the severe nature of the left ventricular hypertrophy. Sudden death (SD) is the most dramatic manifestation of hypertrophic cardiomyopathy (HCM). It is often the first manifestation of the disease. Current data in unselected patient populations report an approximate 0.7% per year incidence of SD. Malignant ventricular arrhythmias (ventricular tachycardia and ventricular fibrillation) are the main mechanisms of SD. Although it is more frequent in a younger age group (<35 years), SD seems to be similarly distributed in all age groups, and in both sexes. 71% of the patients dying suddenly are asymptomatic or have few or mild symptoms.

HCM presents anatomically as abnormal left ventricular thickening without chamber dilation that is usually asymmetrical. It develops in the absence of an identifiable cause and is associated with myocardial fiber disarray. HCM is inherited as an autosomal dominant trait with variable expression. Genotype analysis can identify family members with the mutation (genotype +), even if they have not yet developed clinical signs. The major underlying structural abnormalities in HCM are (1) myocardial cell disarray where the cells are in a disorganized pattern as opposed to a normal parallel myocyte arrangement; (2) coronary microvasculature dysfunction by increased wall/lumen ratio; and (3) remodeling changes. In intra-myocardial arterioles <80 μm, studies have revealed a 2-fold increase in wall-to-lumen ratio, predisposing patients to silent myocardial ischemia, ongoing myocardial injury, and fibrosis. Moreover, these changes are not limited to areas of left ventricular hypertrophyand myocardial remodeling that occur as a compensatory mechanism and can involve changes to the myocytes, fibroblasts, and interstitium. These changes evolve for years before the onset of symptoms. Disorganized myocyte pattern, increased wall/lumen ratio of coronaries, and remodeling changes in HCM patients lead to impaired coronary reserve, diastolic dysfunction, supraventricular and ventricular dysrhythmias, and sudden death.

Cardiac hypertrophy (enlargement) has traditionally been viewed as a compensatory response to hemodynamic changes. Recent studies using more advanced technologies in human patients and animal models indicates that cardiac hypertrophy is a maladaptive process of the heart in response to intrinsic, e.g. hypertension, and extrinsic (e.g. drugs) stresses. Cardiac hypertrophy is a risk factor for QT-prolongation and cardiac sudden death. Recent studies have demonstrated that cardiac hypertrophy significantly affects myocardial electrotonic cell-to-cell coupling, leading to disturbance in action potential duration and potential malignant arrhythmia and sudden cardiac death.

In the hypertrophic phase of cardiac pathogenesis there exist multiple cellular and molecular alterations: each making a distinct contribution to the risk of QT-prolongation and cardiac sudden death. Alterations in the function of cardiac channels, or "cardiac channelopathies" occur

9

at the cellular level in cardiac hypertrophy. Electrotonic cell-to-cell coupling influences the dispersion of repolarization. If myocardial cells with intrinsically different duration of action potential are well coupled, electrotonic current flow attenuates the differences in action potential duration. However, in the hypertrophic myocardium, electrotonic cell-to-cell coupling is disturbed so that the differences in action potential duration become dominant. In addition, in the hypertrophic myocardium, multiple pathological changes occur such as myocardial fibrosis, myocyte hypertrophy, cell death, and disturbance in neuro-hormonal regulation. All of these pathological changes have an important impact on QT-prolongation and cardiac sudden death.

In regards to successful resuscitation from cardiac arrhythmias, success depends not only on the time to initiate resuscitation but also on the nature of the arrhythmia. If out-of-hospital cardiac arrest from ventricular tachycardia or ventricular fibrillation occurs where there are readily available automated external defibrillators (AEDs), such as in a casino, the survival rate has been reported at 74% if resuscitation begins within 3 minutes of collapse. It rapidly falls off in a few minutes. If the arrhythmia is Pulseless Electrical Activity, survival is 1-4% at best; if asystole 0%.

In regard to neck holds, there are two types: the choke hold and the carotid sleeper hold. While these terms are often used interchangeably, in fact they refer to different holds whose purpose is to produce transient cerebral ischemia and unconsciousness. With both holds, the arm and forearm are used to compress the neck and thus the carotid arteries. Compression of the airway usually does not occur and is not necessary for either one of these holds to be effective. What is desired is compression of the carotid arteries. Two-thirds to three-quarters of the blood supply to the brain is provided by the carotid arteries with the remainder supplied by the vertebral arteries. Compression of the carotid arteries for 10-15 seconds produces cerebral hypoxia and loss of consciousness. When the neck hold is released, the victim will regain consciousness within 20-30 seconds with no permanent sequelae. To kill someone using a neck hold, the hold must be continuously maintained at least 2-3 minutes. There is no evidence that a neck hold was used or that it was maintained 2-3 minutes. Since maintenance of a neck hold would produce death by manual strangulation, one would expect petechiae of the conjunctiva and or sclera. These were not present. A person who has had a choke or carotid hold applied does not complain of an inability to breath in that the pressure to compress the carotid arteries is only 11 lbs. while that to compress the airway is approximately 35 lbs. The carotids are compressed before the airway and consciousness is lost in 10-15 seconds.

In regards to a fracture of the cornu of the hyoid, the only significance to it is as a marker of trauma. It does not cause obstruction or impairment of the respiratory system. It can be due to continuous pressure on the neck such as seen in strangulation or a blow to the neck. The blow may be intentional or unintentional, such as in the latter case, may occur in a struggle.

Activation of the TASER$^R$ did not cause or contribute to death. It could only cause death by producing a cardiac arrhythmia, specifically ventricular fibrillation. If it had done so, Mr. Yancy would have gone unconscious in less than 10-15 seconds. He did not do so and thus one can rule out the TASER$^R$.

In conclusion, it is my opinion that Tommy Yancy, a 32 year-old black man, died as a result of a fatal cardiac arrhythmia secondary to a hyper-adrenergic state. The hyper-adrenergic state was due to acute schizophrenic psychosis as well as the adrenergic complications of chronic schizophrenia and the physiological effects of the struggle. All these conditions plus the elevated levels of adrenergic compounds assaulted a diseased enlarged heart producing a cardiac arrhythmia. Mr. Yancy was in acute marijuana intoxication.

I am a physician Board Certified in Anatomical, Clinical and Forensic Pathology. I have testified in state and federal courts throughout the United States as well as in Courts in Canada, England, Columbia, Israel and South Africa. Attached is my Curriculum Vitae which gives details of my education, qualifications, professional experience and publications, as well as a list of cases that I have testified in and a fee schedule. I reserve the right to amend this report should additional information be presented for my review.

Sincerely,

VINCENT J.M. DI MAIO, M.D.