*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

February 21, 2017

Douglas Baxter
Deputy Attorney General
State of California Department of Justice
1300 I Street
P.O. Box 944255
Sacramento, Ca 94244-2550

RE:   Alexis Yancy, et al, vs. State of California; California Highway Patrol, et al.
      Case No.: 15-cv-0580 JM (PCL)

## Introduction

I am a board-certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science for over seven years. I am also an independent researcher on the effects of position and weight force on human physiology, the physiology of neck holds, Excited Delirium Syndrome (ExDS) and in-custody deaths.

I have been retained as an expert to review relevant materials and provide expert opinion on this matter, including the state of the medical and scientific literature as of the date of the incident, May 11, 2014, and today, and to consider and render expert opinion on whether the arrest and restraining process, were contributory to Mr. Tommy Yancy's death. After careful review, it is my opinion to a reasonable degree of medical certainty that Mr. Yancy's cardiac arrest was not caused by the arrest and restraining process by the officers, but rather from Excited Delirium Syndrome and an enlarged heart combined with his exertional resistance. These opinions and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case. This includes, but is not limited to:

### Case-Specific Materials.

1. Photos Boudreaux 05-11-14
2. Audio Recordings of Interviews of Involved Officers and Witnesses
3. Critical Incident Investigation Team (CIIT) Report with Redactions
4. Taser Log
5. Yancy Plaintiffs' Second Amended Complaint
6. Answer by Defendants State of California (CHP), Gilbert Caldera, Heraclio Cardenas, and Robert Gonzales to Second Amended Complaint
7. Initial Disclosures by Defendants State of California (CHP), Gilbert Caldera, Heraclio Cardenas, and Robert Gonzales
8. Responses by Defendant State of California (CHP) to Requests for Admissions Propounded by City of Imperial
9. Responses by Defendant State of California (CHP) to Plaintiffs' Special Interrogatories
10. Responses by Defendant Robert Gonzales to Requests for Admissions Propounded By Defendant City of Imperial
11. Responses by Defendant Gilbert Caldera to Requests for Admissions Propounded By Defendant City of Imperial
12. Responses by Defendant Heraclio Cardenas to Requests for Admissions Propounded by Defendant City of Imperial
13. Tommy Yancy's Military Records
14. Tommy Yancy's VA Medical Records
15. Officer Luna's Mobile Video/Audio Recording System Video
16. Officer Gonzales Mobile Video/Audio Recording System Video
17. Arco AMPM Security Video DVD
18. Cell Phone Video from Elizabeth Perez
19. Deposition of Gilbert Caldera
20. Deposition of Robert Gonzalez
21. Deposition of Heraclio Cardenas

22. Deposition of Sgt Mario Luna
23. Deposition of Detective Richard Kotzin
24. Deposition of Jose Luis Flores
25. Deposition of Vivian Flores

## Medical and Scientific Literature

Chan TC, Vilke GM, Neuman T, Clausen JL: Restraint position and positional asphyxia. Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T: Reexamination of custody restraint position and positional asphyxia. Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL: Spirometry in normal subjects in sitting, prone, and supine positions. Respir Care 2000;45(4):407-410.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM: Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ. Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects. J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC. The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures. J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Cary NRB, et al: The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 1998;525:30.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Rossen R, Kabat H, Anderson JP. Acute arrest of cerebral circulation in man. Arch NeurPsych1943;50(5):510-28.

Iserson K. Strangulation: a review of ligature, manual and postural compression injuries. Annotated Emerg Med 1984;13:179-185.

Koiwai EK. Deaths allegedly caused by the use of "choke holds" (shime-waza). J Forens Sci 1987;32:419-432.

Koiwai EK. Fatalities associate with judo. Physic and Sports Med 1981;9:61-66.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 2) Trauma 1986;28:13-64.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 1) Trauma 1986;27:7-60.

Reay DT, Eisele JW. Death from law enforcement neck holds. Am J Forens Med Path 1982;3:253-258.

Tezuka M. Physiological studies of the Ochi (unconsciousness) resulting from shime-waza (strangle-hold) in judo. Bull Assoc Sci Stud Judo, Kodokan, Tokyo, 1978 Report V:71-73.

Vilke GM, Payne-James J, Karsch SB. Excited Delirium Syndrome (ExDS): Redefining an Old Diagnosis. J Forens Legal Med. 2012;19:7-11.

Vilke, GM, Bozeman WP, Dawes DM, DeMers, G, Wilson MP. Excited delirium syndrome (ExDS): Treatment options and considerations. J Forens Legal Med. [Epub 2012 Jan 24]

Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. J Emerg Med. [Epub 2011 Mar 24]

Wilson MP, Vilke GM. The patient with excited delirium in the emergency department. In Zun LS, Chepenik LG, Mallory MNS editors. Behavioral Emergencies: A handbook for emergency physicians. Cambridge: Cambridge University Press; 2013.

Hughes, E.L., Special Report, Special Panel Review of Excited Delirium, Less-Lethal Devices Technology Working Group, NIJ Weapons and Protective Systems Technologies Center, Penn State.

White Paper Report on Excited Delirium Syndrome. ACEP Excited Delirium Task Force, http://ccpicd.com/Documents/Excited%20Delirium%20Task%20Force.pdf; September 10, 2009.

Bell, L. On a form of disease resembling some advanced stages of mania and fever, but so contradistinguished from any ordinary observed or described combination of symptoms as to

render it probable that it may be overlooked and hitherto unrecorded malady. American Journal of Insanity. 1849; 6:97-127.

Bozeman WP, Hauda WE 2nd, Heck JJ, Graham DD Jr, Martin BP, Winslow JE. Safety and injury profile of conducted electrical weapons used by law enforcement officers against criminal suspects. Ann Emerg Med. 2009 Apr;53(4):480-9. Epub 2009 Jan 21.

Dawes D, Ho J, Miner J. The neuroendocrine effects of the TASER X26: a brief report. Forensic Sci Int. 2009 Jan 10;183(1-3):14-9. Epub 2008 Nov 18.

Eastman AL, et al. Conductive electrical devices: a prospective, population-based study of the medical safety of law enforcement use. J Trauma. 2008 Jun;64(6):1567-72.

Ho JD, Miner JR, Lakireddy DR, Bultman LL, Heegaard WG. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med. 2006 Jun;13(6):589-95. Epub 2006 Mar 21.

Strote J, et al. Conducted Electrical Weapon Use by Law Enforcement: An Evaluation of Safety and Injury. J Trauma. 2009 Dec 22. [Epub ahead of print].

Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC. Physiologic effects of the TASER after exercise. Acad Emerg Med. 2009 Aug;16(8):704-10.

Vilke GM, Sloane C, Levine S, Neuman T, Castillo E, Chan TC. Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26. Am J Emerg Med. 2008 Jan;26(1):1-4.

Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan TC. Physiological effects of a conducted electrical weapon on human subjects. Ann Emerg Med. 2007 Nov;50(5):569-75. Epub 2007 Aug 24.

Ho J, Dawes D, Nelson RS, et al. Acidosis and catecholamine evaluation following simulated law enforcement "use of force" encounters. Acad Emerg Med 2010 Jul;17(7):e60-8.

Vilke GM, Bozeman WP, Chan TC. Emergency Department Evaluation after Conducted Energy Weapon Use: Review of the Literature for the Clinician. J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

Panescu D, Kroll M, Brave M. Cardiac Fibrillation Risks with TASER Conducted Electrical Weapons. IEEE EMBS 2015; 37:323-329.

## Overview of Opinions
(all opinions within this report are to a reasonable degree of medical or scientific certainty and probability)

An overview of my opinions is as follows with more description of each below:

1. The restraining process did not cause the sudden cardiac arrest and death in Mr. Yancy.

2. The use of the TASER ECD did not cause or contribute to the death of Mr. Yancy.

3. There was no consistent clinical evidence of a neck hold on Mr. Yancy and the isolated hyoid bone fracture noted on autopsy did not cause or contribute to his sudden cardiac arrest and death.

4. The dog bite did not contribute to the death of Mr. Yancy.

5. The baton strike did not contribute to the death of Mr. Yancy.

6. Mr. Yancy was exhibiting signs and symptoms consistent with Excited Delirium Syndrome (ExDS), which is the probable cause of his sudden cardiac arrest and death.

7. Mr. Yancy had an enlarged heart that placed him at significant risk of going into sudden cardiac arrest and dying.

8. The time to initiate CPR once the officers noted that Mr. Yancy was not breathing was appropriate and did not cause any harm or worsening of the outcome for Mr. Yancy.

## Analysis

After reviewing the above listed materials, it appears that on May 11, 2014, Mr. Tommy Yancy was pulled over by California highway patrol officers. During the encounter, Mr. Yancy became agitated and an altercation ensued. Mr. Yancy was 32 years old at the time, was 5'11" in height and weighed 260 pounds.

After Mr. Yancy became agitated, highway patrol officers Caldera and Cardenas tried to take him into custody. Mr. Yancy became more aggressive and was described as in a berserk rage,

then highway patrol officer Caldera released his K9 onto Mr. Yancy. The K9 bit his arm, but he appeared impervious to pain. He lifted the dog off the ground, punched it multiple times, and then choked it until the dog was losing consciousness.

Officer Cardenas used his asp twice to the right posterior thigh, but it appeared to have no effect. He then used his TASER electronic control device (ECD) in probe mode to Mr. Yancy's lower back. Officer Gonzalez arrived later and then the officers were able to successfully get him handcuffed.

After handcuffed, they stood Mr. Yancy up to walk him to the car, and then suddenly he twisted and started getting aggressive again. He was taken to the ground and received another TASER ECD activation in drive stun mode. As they were getting ready to place leg restraints on him because he was kicking so aggressively, he suddenly became quiet and when assessed, the officers noted that he had gone into cardiac arrest.

The officers started CPR and EMS arrived to continue resuscitative efforts. He was transported to the emergency department in cardiac arrest status, but ultimately was unable to be successfully resuscitated and he was pronounced dead. The medical examiner opined that Mr. Yancey died from his agitated behavior associated with marijuana intake, needing restraint and other unknown factors. The postmortem examination also revealed a hypertrophic cardiomyopathy which contributed to his death.

Given this history, there are several issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical or scientific certainty or probability based on the information currently available.

Detailed discussion and basis of opinions

1. *The restraining process did not cause the sudden cardiac arrest and death in Mr. Yancy.*

EXHIBIT E at p. 7

During the period that Mr. Yancy was taken to the ground the second time, he was maintained in a position on his stomach with a certain amount of weight placed on him initially to gain control over him. After Mr. Yancy was reported to continue kicking and resisting, which was the reason why one of the officers went to get leg restraints. He was noted to be breathing and struggling and without any reported evidence of respiratory or ventilatory difficulty during this time. He was not reported to complain of shortness of breath or difficulty breathing during this time.

The weight force used on Mr. Yancy was described as follows: Officer Caldera pinned Mr. Yancy's left arm to the ground with his knee. Officers tried to maintain control of the legs and Officer Gonzalez got kicked away. Sgt Luna also was holding the right arm. Officer Alvarez held onto an ankle and pressed down crossing legs. Officer Acevedo was located near Mr. Yancy's head and reported having a knee next to the head and restrained the upper torso against the ground by pushing down on the shoulders with his hands. Officer Kotzin used his left foot to step on Mr. Yancy's lower left leg just above the ankle, then backed away and monitored near Mr. Yancy's feet. Beyond these positions, it was reported that there was no one on top of him when he was still actively resisting.

The timeline based on dispatch records and the video shows that the total time of the struggle was approximately 3.5 minutes, which is not long enough to cause asphyxiation in and of itself.

The majority of the weight force was not even on Mr. Yancy in such a position that would have created the potential to limit ventilation. The weight on the legs would have no impact on ventilation, nor would the controlling of the arms. The weight placed on the shoulders would not significantly limit ventilations enough to cause asphyxiation. Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

Given that Mr. Yancy was alive and resisting throughout the several minute time period on the ground the second time and that the change in status was sudden, coupled with the circumstances of where the weight was placed and the amount of force, there is no evidence that position, restraint or body weight caused or contributed to Mr. Yancy's death.

2. *The use of the TASER ECD did not cause or contribute to the death of Mr. Yancy.*

There are no peer-reviewed published scientific or medical literature that concludes that TASER ECDs cause cardiac dysrhythmias or cardiac arrest in humans utilized in the probe mode away from the chest transcardiac axis. More than 1.5 million volunteer subjects have undergone TASER ECD activations, and none have ever been reported to develop sudden cardiac arrest or die. Just because a TASER ECD was being used in proximity to his death, does not imply causation.

The TASER ECD download reflects 2 five-second activations. The TASER ECD was reported to be used in probe mode to the lower back and in drive stun to the leg. There are nowhere in proximity to the heart, and would have no impact to causing sudden death. If the TASER ECD had "electrocuted" Mr. Yancy, his heart would have gone into a ventricular fibrillation (VF) at the time the electricity was being delivered and he would have immediately lost consciousness at the time that the TASER ECD was firing or within 1-2 seconds after stopping. Subjects in VF cannot fight or struggle, let alone remain conscious as the blood flow to the brain ceases immediately.

The long time period of struggle that Mr. Yancy had after the last TASER ECD activation supports that the TASER ECD did not cause the heart to go into cardiac arrest. This conclusion is also supported in that the first rhythm reported by the paramedics that treated Mr. Yancy shortly after he went into cardiac arrest recorded the first rhythm as asystole, flatline. Asystole is not a rhythm caused by electricity, VF is. And finally, once again, in the medical and scientific literature, there has never been a cardiac arrest or sudden death reported to have occurred as caused by a

TASER ECD that did not involve the probes being located over the transcardiac (across the heart) axis.

In order for one to possibly conclude that a TASER ECD could even be considered to cause cardiac arrest, basically all of the following facts would need to be present:

1) The device probes (not in drive stun mode) would need to be penetrating deep into the chest wall for the tips to be close to the heart (a close dart to heart ratio);

2) The subject would need to have a thin chest wall;

3) The subject to be standing at the time of the TASER ECD activation and leaning forward so that the heart is closer to the anterior chest wall;

4) The subject would need to lose consciousness immediately during the TASER ECD activation or with 1-2 seconds after; and

5) The first cardiac rhythm would need to be ventricular fibrillation.

All of these would be needed to even consider the TASER as the cause of death, but in this case with Mr. Ynacy, NONE of these facts are present. So again, all of the published scientific data as well as the objective evidence available in this case confirms that the use of the TASER ECD was non-contributory to the cardiac arrest and death of Mr. Yancy.

3. *There was no consistent clinical evidence of a neck hold on Mr. Yancy and the isolated hyoid bone fracture noted on autopsy did not cause or contribute to his sudden cardiac arrest and death.*

There was no evidence based on the review of the videos and the reports that a neck hold was attempted on Mr. Yancy. There was noted a single injury on autopsy to the hyoid bone, but this alone does not define that a neck hold was placed. There are no other injuries to other structures of the neck, including the larynx, thyroid cartilages and muscles of the neck.

Neck holds can cause injury and possible death by blocking the airway and asphyxiating an individual by a bar hold or by blocking off blood flow to the brain for so long, that brain damage

occurs from a hypoxic (low oxygen level) injury which then leads to a cardiac arrest by a carotid restraint. In the case of Mr. Yancy, there are no clinical findings of a bar hold. A bar hold is when the arm is pulled across the airway hard enough to cause asphyxiation. When this occurs, there is crushing of the anterior neck structures, leading to significant damage, including to the thyroid and laryngeal cartilage. On autopsy, these findings were not present.

Additionally, there was no report of a carotid "sleeper" restraint, also known as the lateral vascular neck restraint (LVNR), being placed on Mr. Yancy. The pathophysiology and safety of the LVNR are relatively straightforward and well delineated in many texts. The purpose is to place the arm around the neck of the subject to be controlled. The crook of the elbow is placed at the anterior (front) region of the neck and the forearm and upper arm come around the sides and are used to place pressure on the lateral aspects of the neck where the carotid arteries are located. Pressure placed on the arteries diminishes blood flow to the brain, quickly rendering the subject unconscious. This takes time to occur. And if released once unconsciousness occurs, it has been deemed safe for many years of use in martial arts. If the hold is left on for a prolonged period, restricting blood flow to the brain, there is a theoretical risk of death. However, this time period was not present in the case of Mr. Yancy, and there was no evidence of hypoxic brain injury causing his death noted on autopsy. Thus, even though there was an isolated hyoid bone fracture noted on autopsy, there is no evidence that this injury or a neck hold caused or contributed to Mr. Yancy's sudden cardiac arrest and death.

4. **The dog bite did not contribute to the death of Mr. Yancy.**

Mr. Yancy had a K-9 officer place a hold onto his arm. Based on the autopsy, these wounds were superficial and did not cause or contribute to Mr. Yancy's death. I am not aware of any medical literature that links an animal bite with sudden death of this nature. The bite by the K-9 officer did not cause or contribute to the death of Mr. Yancy.

5. *The baton strike did not contribute to the death of Mr. Yancy.*

Although Mr. Yancy reportedly received several strikes with an asp, there were no clinical changes reported at the time of the strike, nor any autopsy findings that indicate that these strikes had any contributing effects to Mr. Yancy's death.

6. *Mr. Yancy was exhibiting signs and symptoms consistent with excited delirium syndrome (ExDS), which is the probable cause of his sudden cardiac arrest and death.*

Excited Delirium Syndrome (ExDS) is a syndrome most commonly caused by use of stimulant drugs like cocaine, methamphetamine or PCP and presents typically with aggressive and often paranoid behavior, but can also be caused by uncontrolled and untreated psychiatric illnesses, particularly schizophrenia. In fact, the original description of ExDS symptoms was in psychiatric patients. And in the days before there were medications to treat these patients, the mortality rate was reported at 75%. Currently, the majority of cases occurs in subjects using illicit drugs and is a significant cause of sudden cardiac arrest.

Classically, people suffering from ExDS are delusional often hallucinating, are hyperactive, may be violent despite threats or overwhelming force, fight inappropriately, be inappropriately dressed for the conditions or take off their clothes, may be sweaty, have elevated body temperatures, and are often breathing fast. They are also often destructive and typically described as having superhuman strength. The subjects who tend to suffer sudden death are commonly noted to have elevated body temperatures.

The actual pathophysiology of ExDS is complex and not well understood. Anatomic and molecular evaluation of ExDS patients who die has focused primarily on postmortem brain examinations. Results demonstrate a characteristic loss of the dopamine transporter in the striatum of chronic drug abusers who die with clinical presentations consistent with and a diagnosis of

ExDS. This suggests that one potential pathway for the development of ExDS is excessive dopamine stimulation in the striatum.

Even more supportive of central dopamine stimulation as a pathway is the fact that hypothalamic dopamine receptors are responsible for thermoregulation. These disturbances of dopamine neurotransmission may help explain the profound elevated temperatures reported in many ExDS patients as well as elevated levels of heat shock proteins, which are found in nearly every cell and act to protect cell proteins from a variety of stressors. The central dopamine hypothesis also provides a link to psychiatric etiologies and the delirious presentation in patients with ExDS.

ExDS places the individual at increased risk for sudden death syndrome, felt by most experts to be caused by an irregular or stoppage of the heartbeat, caused by the increased stress and work on the heart by the excited, over-stimulated, agitated physical state. There are data that this state is caused by a central brain effect and changes in neurotransmitter receptors. Once the heart goes into an irregular beat or stops, blood flow through the body ceases and shortly thereafter, the subject will lose consciousness due to lack of blood flow to the brain and stops breathing. Often, law enforcement officers will notice that the subject has quieted down, thinking that he has finally calmed down and given up the fight. Then a short time later is when someone will identify that the subject is suddenly in cardiac arrest.

Mr. Yancy was demonstrating a number of the signs of a classic presentation of ExDS. Mr. Yancy was exhibiting erratic behavior when he was pulled over for a routine traffic stop and then turned aggressive on the officers.

His fighting against overwhelming force vigorously is also consistent with ExDS. The officers also described him as having phenomenal strength. This is a hallmark finding in ExDS. He also kept on struggling and fighting despite multiple uses of the asp, punches and the TASER ECD, demonstrating tolerance to pain. Even after he was cuffed, he suddenly turned and resumed fighting with the officers. Overall, this clinical presentation by Mr. Yancy was consistent with ExDS.

To come to diagnose Excited Delirium Syndrome, there needs to be an initiating cause. Most often the cause is illicit drug use, however Mr. Yancy did not have any in the classes of drugs that tend to cause ExDS in his system on toxicology at the time of autopsy. However, he had a history of schizophrenia and was reported to be off his medications which is confirmed on autopsy when there was no reportable level of his antipsychotic medication found in his blood. The stopping of psychiatric medications and having untreated schizophrenia is one of the classic causes of ExDS.

Finally, the initial cardiac rhythm of asystole (flat line) is also typical for ExDS. Mr. Yancy was demonstrating signs and symptoms of ExDS from his untreated schizophrenia, which is the probable cause of his sudden cardiac arrest.

7. *Mr. Yancy had an enlarged heart that placed him at significant risk of going into sudden cardiac arrest and dying.*

Additionally, besides being in a state of ExDS, Mr. Yancy had hypertrophic cardiomyopathy of his heart noted on his autopsy. His heart was significantly enlarged, weighing 490 grams. The normal sized heart for a male is typically 300-350g and some sources note possibly up to 400g depending on body size. His agitated state and continued exertion through his resistance would continue to stress this already abnormally enlarged heart. This significant physical enlargement of the heart in and of itself can place an individual at increased risk for sudden cardiac arrest and death from an irregular heartbeat but the continued exertion Mr. Yancy was exhibiting, increased this risk for sudden cardiac arrest.

8. *The time to initiate CPR once the officers noted that Mr. Yancy was not breathing was appropriate and did not cause any harm or worsening of the outcome for Mr. Yancy.*

Based on the review of the reports and the video, it appears that the officers noted that Mr. Yancy had stopped breathing and then shortly thereafter initiated CPR. Based on testimony and the

video, it appears this recognition in the change in status to starting CPR took less than a minute or so to occur. Even if starting CPR took several minutes, the clinical outcome would not have changed.

Mr. Yancey presented with asystole, a flatline cardiac rhythm. Even with optimal resuscitation and immediate access to medical personnel, the survival rate to hospital discharge neurologically intact from this rhythm is only a few percent. Whether CPR was started immediately or several minutes later, the clinical outcome is uniformly dismal.

**Background**

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 70,000 visits. I currently serve as the Medical Director for Risk Management for the UC San Diego Health System. I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for the UCSD Medical Center.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and

with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well. I have been invited to lecture nationally and internationally on this subject. Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on TASER electronic control devices (ECDs) conducted by others. In fact, I was the lead author on work requested by the American Academy of Emergency Medicine (AAEM) to review the totality of the peer reviewed published medical literature on humans and come to conclusions regarding the necessary emergency department evaluation of patients being seen after receiving a TASER ECD activation. I have received federal grant funding and performed extensive clinical research on human subjects who have received TASER ECD applications (articles included in my curriculum vitae) which includes having been involved with over 200 TASER ECD activations and have personally received multiple applications of the device. I have written several book chapters on this topic and have lectured internationally about the physiologic effects of TASER ECDs.

I was also the lead author on work requested by the American College of Emergency Physicians (ACEP) to review the totality of the body of literature on the topic of Excited Delirium Syndrome (ExDS) and wrote up the findings of the expert consensus panel's white paper. I have published a number of papers on the topic, have been grant funded by the National Institute of Justice to study patients with ExDS and invited to write text book chapters on the topic of ExDS. I have also been invited to lecture nationally and internationally on the topics of Excited Delirium Syndrome.

I am knowledgeable of peer-reviewed medical and scientific research on neck holds. I have written several peer reviewed papers and textbook chapters on this topic and have been invited to

lecture on this topic. I am trained as a second-degree black belt in tae kwon do and have been trained in neck holds and have even been personally "choked out" to the point of unconsciousness. Given my own interests in this area, I regularly perform a complete review of the literature regarding neck restraint use.

As a physician working at an urban based emergency department at a Level 1 trauma center, I have evaluated well over a hundred patients over the last 20 years who have suffered from dog bites, with the majority of them being K-9 related injuries. I am knowledgeable of peer-reviewed medical and scientific research on penetrating extremity trauma having authored multiple book chapters in the 5-Minute Emergency Consult textbook.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and CPR practices. I was the Principle Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital cardiac arrest and severe traumatic injury. I have published many peer-reviewed papers on the topic of cardiac arrest and cardiac resuscitation. I also served as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science almost ten years, teaching Advanced Cardiac Life Support (ACLS) both locally and being asked to give lectures on cardiac arrest internationally. I have been an ACLS instructor for over 20 years. I also work at a busy urban comprehensive emergency department where I care for patients in cardiac arrest on a regular basis.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me. Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years. Appendix C is my fee schedule. The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research. Under penalty of perjury,

I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability.

Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Emergency Medicine Clinical Service Chief and Co-Medical Director
Medical Director, Risk Management, UC San Diego Health System
Director, Clinical Research for Emergency Medicine