23 March 2017

Dear Mr. Fox,

As requested, the following report is provided for your review. This report contains rebuttal remarks against the opinions of Dr. Vilke and Dr. Di Maio.

The following rebuttal remarks are directed against Dr. Vilke's report and are consistent with his "numbered" opinions contained within his report.

1) "The restraining process did not cause the sudden cardiac arrest and death in Mr. Yancy."
This is false. Mr. Yancy became unresponsive during the restraining process and the officers initiated CPR efforts and called for EMS support. EMS personnel never regained a pulse on Mr. Yancy. Saying that the restraining process did not cause the sudden cardiac arrest and death is to imply that Mr. Yancy would have suffered a sudden cardiac arrest and death on the same date and time independent of the restraining process. There is absolutely no medical evidence for this occurring. Mr. Yancy's hypertrophic cardiomyopathy was an incidental finding found at autopsy. There is no evidence in the medical records that Mr. Yancy suffered any condition or complication from an "enlarged heart" nor was he treated for any condition or complication due to an enlarged heart.

2) "The use of the TASER ECD did not cause or contribute to the death of Mr. Yancy."
The use of the TASER ECD did not directly cause Mr. Yancy's death. However, the use of this device on Mr. Yancy contributed to his development of a "state of exhaustion" during his struggle with the police officers.

3) "There was no clinical evidence of a mechanical hold on Mr. Yancy and the isolated hyoid bone fracture noted on autopsy did not cause or contribute to his sudden cardiac arrest and death."
There was no "clinical" or video evidence of a mechanical hold on Mr. Yancy during the restraining process. However, there is video evidence of pressure being applied to Mr. Yancy's neck, several third party witnesses stating they saw this same pressure being applied to Mr. Yancy's neck, video evidence of pressure being applied to Mr. Yancy's back while he was lying prone on the ground, and autopsy evidence of pressure being applied to Mr. Yancy's neck from the fractured hyoid bone. Putting enough pressure on a person's neck to fracture their hyoid bone while putting pressure upon their back while that person is lying prone on the ground certainly compromises that individual's ability to breathe thereby placing the person in a situation where their body would elicit a "fight-or-flight" response. This "fight-or-flight" response (also called the hyperarousal response or acute stress response) is a physiological reaction that occurs in response to a perceived harmful event, attack, or threat to survival. The reaction begins in the amygdala which triggers a neural response in the hypothalamus followed by activation of the pituitary gland secreting ACTH and epinephrine and norepinephrine from the adrenal gland. ACTH leads to cortisol secretion which increases blood pressure and blood glucose (among other things) and the increase in catecholamines leads to increased breathing and respiratory rate (among other things). This increase in circulating catecholamines would be significant given this situation of impending asphyxia and also lead to a "state of exhaustion".

Also, the presence of some bleeding around the fractured hyoid bone indicates that the hyoid bone fracture occurred before death.

4) "The dog bite did not contribute to the death of Mr. Yancy."
The dog bite itself did not cause Mr. Yancy's death. However, the fact that the dog "attacked" Mr. Yancy, a "fight-or flight" response was elicited (as evidenced by Mr. Yancy fighting and trying to subdue the dog after the initial attack), thereby increasing his circulating catecholamines and acidosis within his body thereby contributing to the development of a "state of exhaustion".

5) "The baton strike did not contribute to the death of Mr. Yancy."
The baton strike itself did not cause Mr. Yancy's death. However, the fact that the officer "attacked" Mr. Yancy, a "fight-or flight" response was elicited (as evidenced by Mr. Yancy's avoidance of future baton strikes), thereby increasing his circulating catecholamines and acidosis within his body thereby contributing to the development of a "state of exhaustion". It should be noted that after the initial altercation with police officers (The dog attack, being tased twice, baton strike, and take down), Mr. Yancy clearly appeared to be medically stable with no evidence of impending demise. This was evidenced on the video that Mr. Yancy was lying on the ground normally for minutes and later walking normally with the officers. Only after his second altercation with the police officers where pressure was applied to his neck and torso (see above), resulted in Mr. Yancy's death.

6) "Mr. Yancy was exhibiting signs and symptoms consistent with "Excited Delirium Syndrome", which is the probable cause of his sudden cardiac arrest and death."
"Excited Delirium Syndrome" is a "controversial" diagnosis that is NOT found in either the DSM-5 or ICD. The ICD is the International Statistical Classification of Diseases and Related Health Problems or International Classification of Diseases for short. It is the standard diagnostic tool for epidemiology, health management, and clinical purposes maintained by the WHO. The ICD is a healthcare classification system, classifying diseases from a wide variety of signs, symptoms, abnormal findings, complaints, social circumstances, and external causes of inury or disease. The DSM-5 is the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition and is the American Psychiatric Association's classification and diagnostic tool and serves as a universal authority for psychiatric diagnosis and treatment recommendations in the United States. However, the term "excited delirium" has been accepted by the National Association of Medical Examiners and the American College of Emergency Physicians, who argued that "excited delirium" MAY be described by several codes within the ICD. The epidemiology of "excited delirium" is claimed to arise most commonly in males with a history of serious mental illness and/or acute or chronic drug abuse, particularly psycho-stimulant drugs such as cocaine, methamphetamine, phencyclidine (PCP or "angel dust"), and Alcohol withdrawal. None of this was present in Mr. Yancy except that he had a mental illness. (Also, no sign of "Delirium" b/c he is responding normally to the situation)... Also, other drugs associated with "excited delirium" are the use of antipsychotic medications and Mr. Yancy was determined not to have any of these medications present in his blood stream. In his report, Dr. Addario confirms the absence of antipsychotic medications on autopsy studies (page 41 of his report).  However, the pathophysiology of "Excited Delirium" has been unclear. It likely involves multiple factors such as "Restraint or Positional Asphyxia" hyperthermia, drug toxicity, and/or catecholamine-induced fatal cardiac arrhythmias. It is interesting to note that "Excited Delirium Syndrome" has been

described as having similar presentations as that of "Restraint Asphyxia (or Positional Asphyxia)". Restraint or Positional Asphyxia has been described as maybe a factor in a significant number of people who die suddenly during restraint by police, prison officers, and health care staff. Restraint Asphyxia is a form of asphyxia that prevents someone from breathing adequately. Risk factors for Restraint Asphyxia include prolonged restraint, obesity, cardiac or respiratory problems, and illicit drug use such as cocaine, AND kneeling or otherwise placing weight on the subject. Mr. Yancy was subjected to a prolonged restraint where officers placed their weight upon him minimizing chest expansion and his neck thereby fracturing his hyoid bone. Other than the use of marijuana (which typically depresses the central nervous system), there was no evidence that Mr. Yancy was taking any "stimulant" drugs either prescribed or illicitly used at the time of his altercation with the police officers and his death. Mr. Yancy was nearing exhaustion (see above) during his prolonged altercation with the police officers thereby increasing his risk for asphyxiation by reducing the time it would take to be asphyxiated. The cause of death was asphyxia.

7) "Mr. Yancy had an enlarged heart that placed him at significant risk of going into sudden cardiac arrest and dying."
Mr. Yancy's cardiac condition was only made known through autopsy. There was no evidence in the medical records that Mr. Yancy suffered from any condition or complications from an "enlarged heart" nor was he treated for any condition or complications from an "enlarged heart". Mr. Yancy was performing his activities of daily living prior to the altercation with the police officers showing no signs of a heart condition.

8) "The time to initiate CPR once the officers noted that Mr. Yancy was not breathing was appropriate and did not cause harm of worsening of Mr. Yancy's outcome."
The CPR efforts did not cause harm or worsen Mr. Yancy's condition because he died. The CPR efforts were unfortunately unsuccessful.

The following rebuttal remarks are directed against Dr. Di Maio's opinions contained within his report:

Dr. Di Maio describes "pressing", a medieval method of torture and execution, last used on this continent over 300 years ago, in which increasing weight is applied in an attempt to reduce one's breathing capacity. "Pressing" does not describe what happened to Mr. Yancy.

Dr. Di Maio opines that Mr. Yancy's cause of death was the "result of a fatal cardiac arrhythmia secondary to hyperadrenergic state'" and that "the hyperadrenergic state was due to acute schizophrenic psychosis as well as adrenergic complications of chronic schizophrenia and the physiological effects of the struggle." Dr. Di Maio certainly includes the struggle as a source of the hyperadrenergic state but he implies that Mr. Yancy's mental illness played the major role in the development of the hyperadrenergic state leading to Mr. Yancy's fatal arrhythmia. Mr. Yancy had a long history of mental illness which he lived with without any clinical evidence of cardiac disease and his cardiac disease was only made evidence upon autopsy after a strenuous physical struggle in which he was attacked by a police dog, tased twice, was subjected to pressure being applied to his

torso and neck and resulting a fractured hyoid bone. People with schizophrenia are typically reserved and self isolated, and only appear to exert themselves physically when agitated. Mr. Yancy's asphyxiation was the cause of his death. Mr. Yancy was seemingly fine after the dog attack, taser attack, baton strikes, and take down and only dies after he was asphyxiated (see above).

Dr. Di Maio opines on the time course of "unconsciousness" with different physiological events but does not mention the effect that the development of exhaustion has on this time course. Also, the time to unconsciousness due to asphyxia can be extremely variable based upon one's underlying physical medical condition and the length of time of a physical struggle prior to asphyxia being initiated.

Dr. Di Maio also includes the use of marijuana in his cause of death paragraph implying that this played a role in Mr. Yancy's demise. Marijuana does not make one hyper-excitable or induce a hyperadrenergic state on someone. In fact, it has the opposite effect and is used medicinally for patients with chronic intractable pain syndromes. Mariuana did not play a role in Mr. Yancy's demise.

Dr. Di Maio makes remarks about two types of neck holds and the time to unconsciousness with each hold. Mr. Yancy was not subjected to any neck hold (either by testimony or video evidence), but instead trauma to his neck.

Dr. Di Maio also remarks that a fracture of the hyoid itself does not cause obstruction or impairment of the respiratory system but that "a fracture of the cornu of the hyoid, the only significance to it as a marker of trauma". The presence of the hyoid bone fracture in Mr. Yancy's case is clearly indicative of the neck trauma the he sustained during his altercation with the police officers. Dr. Di Maio remarks that it takes approximately 35 lbs. of pressure to compress the airway and based upon the video evidence, much more than 35 pounds of pressure was applied to Mr. Yancy's neck during his final altercation with the police officers.

Respectfully Submitted,

Richard Boehme, MD, PhD