# EXHIBIT 2

## TO

## DECLARATION OF EDWARD P. WOLFE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE DEFENDANTS' CUMULATIVE EXPERT WITNESS TESTIMONY FROM GARY VILKE, M.D.

```
            UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF CALIFORNIA


ALEXIS YANCY AND JAYDEN YANCY, BY  )
AND THROUGH THEIR GUARDIAN AD      )
LITEM, KATHERINE HAWK,             )
INDIVIDUALLY AND ON BEHALF OF THE  )
ESTATE OF TOMMY YANCY JUNIOR,      )
DECEASED,                          )
                                   )
              PLAINTIFFS,          )
                                   )
         vs.                       )  Case No. 15-CV-0580
                                   )            JM JLB
STATE OF CALIFORNIA; CALIFORNIA    )
HIGHWAY PATROL; CITY OF IMPERIAL;  )
CITY OF IMPERIAL POLICE            )
DEPARTMENT; COUNTY OF IMPERIAL;    )
COUNTY OF IMPERIAL'S SHERIFF'S     )
DEPARTMENT; JOSEPH A. FARROW;      )
RAYMOND LOERA; MIGUEL COLON, JR.;  )
GILBERT CALDERA; HERCILIO          )
CARDENAS; ROBERT GONZALEZ, AND     )
DOES 1 THROUGH 25, INCLUSIVE,      )
                                   )
              DEFENDANTS.          )
_____)



                   DEPOSITION OF

               GARY M. VILKE, M.D.

               SAN DIEGO, CALIFORNIA

                  AUGUST 2, 2017



Reported by:
LORENA BARRÓN
CSR NO. 12058
NO. 17-55120A
```

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   ALEXIS YANCY AND JAYDEN YANCY, BY  )
     AND THROUGH THEIR GUARDIAN AD      )
 5   LITEM, KATHERINE HAWK,             )
     INDIVIDUALLY AND ON BEHALF OF THE  )
 6   ESTATE OF TOMMY YANCY JUNIOR,      )
     DECEASED,                          )
 7                                      )
                    PLAINTIFFS,         )
 8                                      )
               vs.                      )  Case No. 15-CV-0580
 9                                      )           JM JLB
     STATE OF CALIFORNIA; CALIFORNIA    )
10   HIGHWAY PATROL; CITY OF IMPERIAL;  )
     CITY OF IMPERIAL POLICE            )
11   DEPARTMENT; COUNTY OF IMPERIAL;    )
     COUNTY OF IMPERIAL'S SHERIFF'S     )
12   DEPARTMENT; JOSEPH A. FARROW;      )
     RAYMOND LOERA; MIGUEL COLON, JR.;  )
13   GILBERT CALDERA; HERCILIO          )
     CARDENAS; ROBERT GONZALEZ, AND     )
14   DOES 1 THROUGH 25, INCLUSIVE,      )
                                        )
15                  DEFENDANTS.         )
     _____)
16
17
18
19
20          Deposition of GARY M. VILKE, M.D., taken on
21   behalf of Plaintiffs at 600 West Broadway, Suite 1800,
22   San Diego, California, commencing at 10:20 a.m.,
23   Wednesday, August 2, 2017, before Lorena Barrón, CSR.
24   No. 12058.
25
```

```
 1                    GARY M. VILKE, M.D.
 2              Having first been duly sworn, was
 3              examined and testified as follows:
 4
 5                         EXAMINATION
 6   BY MR. FOX:
 7         Q    Good morning.
 8         A    Good morning.
 9         Q    Can you state and spell your name for the
10   record?
11         A    Sure.  Gary Michael Vilke.  G-a-r-y,
12   M-i-c-h-a-e-l, V as in Victor, -i-l-k-e.
13         Q    All right.  And where do you work?
14         A    At the University of California San Diego
15   Medical Center.
16         Q    And what is your title there?
17         A    My position is an emergency physician.  I have
18   several academic administrative titles.
19         Q    All right.  And can you give us a snapshot of
20   those?
21         A    Sure.  I'm the service chief for the emergency
22   department.  That's basically serving as the medical
23   director for our clinical operations.  I'm the medical
24   director for risk manager for the UC San Diego health
25   system.  I'm the director of the clinical research
```

```
 1  fellowship, and the director of clinical research.
 2       Q     Okay.  Do you have any certifications in
 3  biomechanics?
 4       A     I do not.
 5       Q     And how about forensic pathology?
 6       A     I do not.
 7       Q     Not board certified in forensic pathology as
 8  well, correct?
 9       A     Correct.
10       Q     All right.  And no fellowship in that area?
11       A     Correct.
12       Q     And then I saw you brought a binder with you.
13       A     Yes.
14       Q     Do you mind if I take a look at that?  As I
15  understand, this binder, as well as other documents in
16  your vehicle, comprise the universe of documents that
17  you looked at?
18       A     That is correct.  I can go through it with you
19  if you want or just you can look at them, whichever's
20  easier.
21       Q     Well, I'll start.  On the left side is emails,
22  correspondence?
23       A     Yes.
24       Q     And this is -- looks like some of your hours?
25       A     Correct.
```

```
 1      Q    Okay.  Anything other than the comments, the
 2  interaction with the dog, the kicking you said you saw
 3  on the video, and the walk back to the police car that
 4  appear to you to be physically aggressive or violent
 5  from Mr. Yancy?
 6      A    It covers most of the interaction getting out
 7  of the car with the dog on the ground.  There's not much
 8  left to the video.  That's all.  I think that's about
 9  it.
10      Q    That's about it?
11      A    Yeah.
12      Q    Okay.  Did you read -- you read Dr. Graham's
13  report in the case?
14      A    I did, yes.
15      Q    Okay.  Where is it that -- it appears to be
16  some overlap between your opinion and Dr. Graham's
17  opinion; is that fair?
18      A    Sure, yeah.
19      Q    Okay.  Where is it that you'd say your
20  opinion -- obviously, you've done enough cases to know
21  that you can only have one expert to each subject area,
22  correct?
23      A    Correct.
24      Q    Where is it that you'd say that your opinion
25  sort of stops and Dr. Graham's begins?  How do you
```

```
 1  separate the two of your opinions?
 2      A    Usually, the way it looks, I'm -- as an
 3  emergency physician, I see people who are typically
 4  alive and in states of excited delirium, and how they
 5  can or can't go into the portion where they die.
 6           Dr. Graham tends to work with the autopsy and
 7  works backwards.  He works with the autopsy findings,
 8  toxicology reports, whatnot, and then he works with the
 9  materials of -- what were the circumstances surrounding
10  that death?  And then in the middle is where we both
11  merge with the same diagnosis.
12      Q    Okay.  Is it fair to say, then, you are --
13  you're reviewing the materials of Mr. Yancy pre-death to
14  come to the conclusion that excited delirium was a
15  contributing cause of death and, for example, not the
16  compression of the neck, that Dr. Graham is looking at.
17  Things after death, meaning, the body itself.
18      A    That's the starting points.  I review
19  everything.  I'm not gonna ignore the autopsy findings.
20  If there's something on there that -- else caused his
21  death and vice versa.  Dr. Graham is not gonna ignore
22  the stuff that was preceding it.
23           But, basically, when I'm looking at a case, I
24  look at the history, the schizophrenic background, the
25  not being on meds.  You know, the videos, the agitation,
```

```
 1  all the stuff there, the cardiac arrest and then the
 2  finding beyond that, you know, the autopsy or lab work
 3  or whatever is available.  And the forensic pathologist
 4  tends to start with, I've got a body.  Looking at the
 5  findings there.  Looking at the surrounding features and
 6  working backwards to what happened beforehand.
 7       Q    You mentioned that -- that you look at the
 8  history of the background, whether or not he's on
 9  medication, the videos and the lab work.  Dr. Graham
10  looked at all that material as well, right?
11       A    Ultimately, he'll probably want to look at
12  that from their reverse direction, correct.
13       Q    Okay.  But in the end, you guys are both
14  reviewing the same material and coming to the same
15  conclusion that excited delirium was the cause of death,
16  correct?
17       A    Ultimately, I think we end up reviewing most
18  of the same material, because that's the right way to
19  review a case.  And looking for the different
20  perspectives of living to dead versus body to what --
21  before that.  But, yeah, we end up coming to the same
22  conclusions.
23       Q    In your report, Exhibit 3.
24       A    Okay.
25       Q    Um, for these articles, do you have copies
```

```
 1        I, Lorena Barrón, a Certified Shorthand Reporter
 2   of the State of California, do hereby;
 3        That the foregoing proceedings were taken
 4   before me at the time and place herein set forth; that
 5   any witness in the foregoing proceedings, prior to
 6   testifying, were administered an oath, that a record
 7   of the proceedings was made by me using machine
 8   shorthand which was thereafter transcribed under my
 9   direction; that the foregoing transcript is a true
10   record of the testimony given.
11        Further, that if the foregoing pertains to
12   the original transcript of the deposition in a Federal
13   case, before completion of the proceedings, review of
14   the transcript was requested.
15        I further certify I am neither financially
16   interested in the action nor a relative or employee of
17   any attorney or any party to this action.
18        IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
21   DATED: August 22, 2017
22
23                    _____
24                         LORENA BARRÓN
                           CSR No. 12058
25
```