# EXHIBIT A

20 February 2017

EXPERT REPORT

Prepared for

The Fox Law Firm

On Behalf of Plaintiff

RE: Yancy vs State of California; California Highway Patrol; City of Imperial; etc.

In The United States District Court, Southern District of California

Case No. '15CV0580 JM PCL

Witness Qualifications:

I am Board Certified by the American Board of Psychiatry and Neurology with special qualifications in Neurology. I am licensed to practice Medicine in the states of Florida, Georgia, Alabama, Oklahoma, and New Mexico. I am currently engaged in private practice as a Neurologist at Neurology Associates of North Florida; 1361 13th Avenue South, Suite 170A, Jacksonville Beach, FL 32250.

I earned a BS degree in Aerospace Engineering with merit from the US Naval Academy in 1978. I underwent post-graduate training in Nuclear Engineering and Nuclear Plant Operations and served on board US Nuclear Submarines in the US Navy as a Nuclear Trained Engineering Officer for four years. I earned a Medical Degree (MD) from the University of Alabama, School of Medicine in Birmingham. I also obtained Doctor of Philosophy (PhD) in Biomedical Engineering from the University of Alabama at Birmingham. I performed my Internship in General Surgery and Residency in Neurology at Bethesda Naval Hospital (National Naval Medical Command). I am Board Certified in Neurology. I also have special training in Neuroradiology. As indicated in my Curriculum Vitae, attached hereto, I served as an Emergency Room Physician for ten years and Director of the Emergency Department and Emergency Medical Service (EMS) for six years.

Information Considered:

1) El Centro Regional Medical Center Medical Records (dated May 11, 2014)
2) Loma Linda Healthcare System Records (dated January 18th, 2007 -June 10th, 2008)
3) VA San Diego Records (dated July 21st, 2008-April 29th, 2014)
4) VA Loma Linda Records (dated September 8th, 2008- December 30th, 2008)
5) Desert Rehab Institute Records (dated September 15th, 2011)
6) California EMS Report dated May 11, 2014
7) Imperial County Coroner's Report (#14-074) dated November 19, 2014 by Rodolfo Barron
8) Imperial County Autopsy Report (Coroner's Case #14-074) dated May 13, 2014 by Darryl Garber, MD (Forensic Pathologist).

9) Photographs of Mr. Tommy Yancy
10) Critical Incident Criminal Investigative Report (CICIR) dated May 11, 2014
11) Defendants Initial Expert Witness Designation
12) Multiple Videos of the Actual Incident of May 11, 2014
13) Deposition of Kimberly Gonzalez, dated January 17, 2017
14) Deposition of Lorena Samaniego, dated January 17, 2017

Basis of Opinion:

In forming my opinions, I reviewed the material provided for me by Counsel and have relied on the following facts below:

Mr. Tommy Yancy with a past medical history of HTN, chronic kidney disease, schizophrenia, PTSD, and ETOH and cannabis dependency was pulled over by police on May 11, 2014 for a license plate infraction. Mr. Yancy was driving a 2010 Chrysler 300 and his front license plate was on his dashboard.

Mr. Yancy's past criminal history includes a conviction for a "hit and run" in 2005, a conviction for possession of a dangerous weapon, controlled substance possession, and terrorist threat (showed up at house of ex-wife and tried to gain entry; police found a large knife on his person in his pants) in 2007, a DUI in 2009 and had his license suspended for two years, and was charged in 2011 for driving without a license. His ex-wife also had a restraining order from 2007 -2010 and another restraing order was granted in 2011 for "continued threats" against his ex-wife.

Per the officer's report, the Officer Caldera noticed marijuana aroma from the inside of Mr. Yancy's car and Mr. Yancy did not readily egress from his vehicle when ordered which resulted in the officers trying to pull Mr. Yancy from his vehicle. Mr. Yancy demonstrated aggression towards the Officers and after pulling away from Mr. Yancy, the officers ordered Mr. Yancy to get down on the ground. When Mr. Yancy did not get onto the ground, the Police Dog (Jambo) was released onto Mr. Yancy, who grabbed the dog and started to choke the dog. Mr. Yancy was "tazed" at 1:26 pm and handcuffed. Mr. Yancy demonstrated continued resistance and aggression and was "tazed" again at 1:29pm after which he became unconscious.

Per the Critical Incident Criminal Investigative Report, Officer Caldera was on duty with "Jambo" the dog. At 1:22pm the traffic stop was initiated. At 1:23pm, Officer Caldera called for backup on the radio. At 1:24pm, Officer Cardenas arrived. At 1:26, Officer Cardera requested more urgent backup. After the first struggle (with Mr. Yancy), "Jambo" was deployed and made contact with Mr. Yancy. At 1:27pm, the situation (with Mr. Yancy) was reported as stable and the paramedics were requested. The second "struggle" ensued and Mr. Yancy became "unresponsive" and the Officers started CPR.

EMS personnel made contact with Mr. Yancy at 1:35pm and noted that Mr. Yancy was in a supine position with police officers performing CPR. Their (EMS personnel) history stated that Mr. Yancy was "tazed", dropped to the ground, started shaking, then stopped, and was unresponsive for 9 minutes before CPR being initiated.

Emergency Treatment Records show that Mr. Yancy arrived at 2pm and was comatose. Medical treatment continued until Mr. Yancy was pronounced dead at 2:36pm.

According to the CICIR, Officer Gastellum arrived as other officers were performing CPR. The paramedics arrived and took over. Mr. Yancy's eye were noted to be wide open and he vomited as he was loaded onto the ambulance. He was noted by the paramedics to be without breath sounds or a pulse when they initially assessed him and Mr. Yancy never regained a pulse on the way to the ER.

Mr. Yancy's clothing demonstrated red fluid on his left sleeve and lower back, brown stains on the collar, puncture holes on the back of his shirt, red fluid on the upper left leg and at the front and rear of his crotch, and 6.9 grams of marijuana in a baggy found in his pocket.

An Autopsy was performed on Mr. Yancy on May 13, 2014 by Darryl Garber, MD. Photographs and X-Rays were taken.

Photographs of Mr. Yancy demonstrated bruising and scratching on right cheek, bruising and scratching on left cheek near the eye, bruising and scratching on the right arm below the elbow and the right hand, markings on the inner right and left foot (questionable burn marks), markings on both knees, marking on the proximal left arm, and marking on the left wrist.

Description of Mr. Yancy's external injuries are described on page three of the Autopsy Report.

On page three of the Autopsy Report, there is a "Description of Compression of Neck" section describing an incomplete fracture of the left hyoid bone comu. The fracture site was surrounded by a 0.9 x 1.1 fresh hemorrhage. No other injuries of the neck were identified.

The Police Cam video was reviewed.

A video apparently taken by a cell phone from across the street documenting the incident was reviewed. The time markings are taken from the video and don't represent "real time". At time 12:19:20 Mr. Yancy is sitting up; at time 12:19:40 Mr. Yancy rolls over; at time 12:20:06 Mr. Yancy is on the ground in a prone position with his head/neck extending upwards; at time 12:20:26 Mr. Yancy extends his head/neck; at time 12:20:42 there are two officers by Mr. Yancy-one is standing and one is squatting; at time 12:21:28 there are two officers standing by Mr. Yancy/there is no struggle. There is a blackout on the video from 12:21:39 to 12:23:00. Right after the blackout, there are four officers standing around Mr. Yancy. From time 12:23:43 to 12:24:25, an officerin a light colored uniform was positioned over Mr. Yancy in such a way that his left leg was extended rearward without his knee touching the ground, his right leg was flexed at the knee with the knee compressing against Mr. Yancy's neck, and his right arm is extended at the elbow with his hand on Mr. Yancy's torso.

Witness accounts of the incident (Deposition testimony) describes pressure being applied to Mr. Yancy's "shoulder to neck area" and "shoulder to the head area" by the police officer wearing the tan uniform during the incident.

Mr. Yancy's medical records before May 11, 2014 were reviewed.

Opinions:
- A) Medical:
    1) Mr. Yancy suffered blunt trauma to the neck as evidenced by the hyoid bone fracture and fresh surrounding hemorrhage.
    2) The hyoid bone is rarely susceptible to trauma because it is protected by the mandible and

cervical spine.
3) Isolated fractures of the hyoid bone are usually due to manual strangulation, hanging, projectiles, or blunt trauma.
4) Force or pressure application to the neck resulting in fractures of the hyoid bone are likely to prove fatal because of asphyxia due to pharyngeal and laryngeal spasm.
5) Mr. Yancy's cause of death was due to asphyxiation from blunt neck trauma.

B) Biomedical Engineering:
1) Due to the positioning of the officer in the light colored uniform over Mr. Yancy from 12:23:43 to 12:24:25 on the video (see above), most of his weight was exerted directly to the left side of Mr. Yancy's neck (The right side of Mr. Yancy's face was bruised with scratches) causing the fracture of the left hyoid bone cornu with surrounding hemorrhage and subsequent compression of the trachea.
2) With Mr. Yancy's head turned to the side, there was some torsional loading upon the trachea, and with the application of a "heavy" load to the left side of the trachea would result in compression of the trachea thereby compromising Mr. Yancy's ability to breathe.
3) The amount of force applied to Mr. Yancy's neck by the weight of the officer transferred through his knee would exceed the force applied by strangulation by hands. Given his position upon Mr. Yancy taken from the video approximately 69% of the officer's weight would be transferred to Mr. Yancy's neck through his knee. So if the officer weighed 160 pounds, the force applied to Mr. Yancy's neck would have been 110 pounds and if he weighed 180 pounds, the force applied to Mr. Yancy's neck would have been 124 pounds.

I am prepared to provide any further opinions if needed as more discovery material becomes available.

I am also prepared to provide rebuttal opinions if needed upon receipt of opposing expert reports.

Compensation:

As compensation for my work in this case, I anticipate charging any expenses plus my normal rate as follows:

1) Record review and research: $400/hour
2) Deposition Testimony: $1000/hour
3) Trial testimony $4500

Former Testimony:

The following is a listing of other cases in which I have testified as an Expert Witness or a Treating Physician at trial or by deposition dating back to 2003 and 2008, respectively. (See Attachment (2)).

Very Respectfully Submitted,

Richard Boehme, MD, PhD

Attachments:

# EXHIBIT B

# WERNER U. SPITZ, M.D., FCAP

*Forensic Pathology and Toxicology*
23001 Greater Mack
St. Clair Shores, Michigan  48080

Phone:  586 776-2060    Fax:  586 776-8722

Diane L. Lucke, B.S.                                                    E-mail:  wuspitz@aol.com
Administrative Assistant/Office Manager

February 23, 2017

Bill Bender, Esq.
Bender & Gritz
Diamond View Tower
350 Tenth Avenue, Suite 900
San Diego, CA  92101

Re:     Tommy Yancy v California Highway Patrol
        Our File No:  6450

Dear Mr. Bender:

I am in receipt and have reviewed the following items which you sent to me for my review and opinion of how Tommy Yancy died.

- Coroner's report
- Autopsy protocol
- Toxicology report
- Autopsy photographs
- Postmortem x-ray films
- CICI report including photographs
- Photographs of blood on patrol car window
- Paramedic and ER records
- Summary of Tommy Yancy's medical chronology
- Incident videos provided from the Cardenas deposition exhibits described as:
    Gonzales MVAR
    Video 407 and 408
    AM/PM Cam 11
    Witness Stabilized – Cropped

According to the records, Tommy Yancy (5'11" [71"] – 260 lbs) was an overweight, 32 year old, African American male with a BMI of 36.3.

Bill Bender, Esq.
Re:  Tommy Yancy v California Highway Patrol
February 23, 2017
Page two


On May 11, 2014, at approximately 1:22 PM, Tommy Yancy, the driver and sole occupant of a vehicle, was pulled over by California Highway Patrol (CHP) officers. When Officer Gilbert Caldera approached the vehicle, he smelled the odor of marijuana coming from inside, whereupon he ordered Yancy out of the car, to which Yancy refused to comply. A struggle developed, with the officers who arrived on scene pursuant to Caldera's call for backup, in which Yancy was bitten by a police dog, tazed and handcuffed. The records indicate that eleven officers from three jurisdictions arrived on scene. One of the videos shows at least five, maybe six officers swarming and bent over Yancy, pushing him down as he is in prone position, trying to rise to enable his breathing, while additional officers are standing by.

Rudolfo Barron, the Deputy Coroner who investigated the death of Tommy Yancy, described viewing videos showing the arrest, the struggle, Yancy being taken to the ground and being held by the neck which caused him to become unresponsive. The Deputy Coroner states on Pages 8 and 9 of his report "at approximately 1:43 PM, the decedent (Yancy) was being escorted by Officer Caldera, toward the unit that had a camera recording. Officer Caldera is seen holding onto the decedents left arm with his left arm and has his right hand at the base of the decedent's neck while he escorts him." "Seconds later officers are seen struggling over someone on the ground." At 1:46 PM, the officers appear to notice Yancy is in distress and start rendering CPR.

EMTs took Yancy to the hospital where he was pronounced dead at 2:36 PM.

On May 13, 2014, at approximately 9:55 AM, an autopsy was performed by Dr. Darryl J. Garber. The autopsy report indicates Yancy had a protuberant anterior abdominal wall when in supine position on the autopsy table. Further, external examination of the body reveals multiple abrasions, contusions and lacerations of

Bill Bender, Esq.
**Re:   Tommy Yancy v California Highway Patrol**
February 23, 2017
Page three

the face, posterior torso, bilateral upper and bilateral lower extremities. Some of these injuries are consistent with prone restraint during a struggle, the facial injuries are consistent with blood on the side of a vehicle depicted in photograph labeled (Yancy – bloody window photo img_2037). It appears that this may have occurred when Yancy rubbed up against the side of the vehicle during the arrest.

The cause of death was listed as "Agitated behavior associated with marijuana intake needing restraint and other unknown factors." The manner of death was determined as Accident. Hypertrophic cardiomyopathy contributed to death.

Findings at the autopsy included a fractured hyoid with fresh hemorrhage surrounding the fracture site. The hyoid is a horse shoe shaped bony structure situated in back of the lower jaw. The base of the tongue rests on the hyoid. Fracture of the hyoid usually occurs when pressure/compression is applied to the neck either by a hand, as in strangulation, or by an arm, so-called bar arm or choke-hold, or by a karate chop or similar type of force. In and of itself, a fractured hyoid is not a fatal injury however, its presence indicates significant trauma to the neck area.

All facts considered in this case, there can be no doubt that significant trauma was applied to Tommy Yancy's upper neck during the struggle with police during a traffic stop on May 11, 2014. It is this trauma which led to Yancy's death.

Essentially, the type of trauma in cases where the hyoid is found to be fractured is akin to strangulation. Since, compression of the neck or swelling of the delicate soft tissues of the throat lead to obstruction of the airway and is always associated with air hunger and conscious pain and suffering, interference with the ability to breathe and fear of doom, fear of death. An individual who is subjected to interference with their ability to breathe will always fight back,

Bill Bender, Esq.
**Re: Tommy Yancy v California Highway Patrol**
February 23, 2017
Page four

always with all the energy they can muster. This is the instinct of survival. When a person cannot breathe, they realize very quickly their death is imminent and they fight with all they have.

The brain weighs approximately 2% of body weight but the brain is more susceptible to oxygen deprivation than any other organ, requiring 20% of total available oxygen (Medical Physiology, Guyton and Hall, Elsevier and Saunders, 2006). To have this quantity of oxygen available, unencumbered breathing must remain uninterrupted at all times.

The issue of respiratory impairment due to restraint has been explored by the Canadian Police Research Centre. Their report states "respiratory impairment becomes particularly crucial when a weapon is used or restraint is applied during, or at the end of a prolonged physical struggle. The ability to breathe freely is critical as the body tries to return to homeostasis and compensate for metabolic acidosis incurred during periods of prolonged anaerobic activity, such as that incurred during a prolonged struggle. During such struggle, rapid breathing allows the body to eliminate $CO_2$, allowing pH to remain constant; suppression of effective respiration may inhibit the body's ability to compensate." (Manojlovic, D., Hall, C., Laur, D., Goodkey, S., Lawrence, C., Shaw, L., St-Amour, S., Neufeld, A., and Palmer, S. (2005). *Review of Conducted Energy Devices.* Canadian Police Research Centre: Ottawa (Canada). TR-01-2006.)

As shown by the autopsy, Tommy Yancy was a well-developed and healthy individual with a slight enlargement of the heart 490 grams (normal heart weight up to 400 grams in a normal weight individual). Yancy was overweight, weighing 260 pounds. Consequently, mild enlargement of the heart is not unusual. Further, enlargement of the heart, as in this case, is treatable with medication.

Bill Bender, Esq.
**Re:   Tommy Yancy v California Highway Patrol**
February 23, 2017
Page five

Lastly, and with all due respect to my colleague, Dr. Garber, Tommy Yancy did not die nor was his death in any way related to the use of marijuana or any other mind altering drug. Marijuana is a sedative. To my knowledge, no death from the use of marijuana has as yet been published. Neither is this death due to cardiomegaly.

The autopsy and his medical history revealed no findings to suggest anything but a normal life expectancy, currently estimated to at least age 80, based on the life expectancy charts of the major life insurance companies and the CDC.

But for Tommy Yancy's restraint with interference of his ability to breathe, Yancy would still be alive today, with a normal life expectancy of at least an additional 50 years.

My opinions are based on the education, training and experience and are rendered to a reasonable degree of medical certainty.

          Sincerely yours,

          Werner U. Spitz, M.D.

WUS:dll
Dk:bend022317cor6450