XAVIER BECERRA
Attorney General of California
RICHARD F. WOLFE
Supervising Deputy Attorney General
TERRY R. PRICE
Deputy Attorney General
EDWARD P. WOLFE
Deputy Attorney General
State Bar No. 247835
 600 West Broadway, Suite 1800
 San Diego, CA 92101
 P.O. Box 85266
 San Diego, CA 92186-5266
 Telephone: (619) 738-9081
 Fax: (619) 645-2581
 E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for Defendants*
*CHP Officer Gilbert Caldera and*
*CHP Officer Salvador Acevedo*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALEXIS YANCY AND JAYDEN YANCY, BY AND THROUGH THEIR GUARDIAN AD LITEM, KATHERINE HAWK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMMY YANCY, JR., DECEASED,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA HIGHWAY PATROL OFFICER GILBERT CALDERA; CALIFORNIA HIGHWAY PATROL OFFICER SALVADOR ACEVEDO**<br><br>Defendants. | 15-cv-0580 JM (PCL)<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Courtroom: 5D<br>Judge: Hon. Jeffrey T. Miller<br>Trial Date: January 16, 2018<br>Action Filed: 3/13/2015 |

# INTRODUCTION

This action arises from the death of Tommy Yancy on May 11, 2014 during his arrest by California Highway Patrol and City of Imperial Police officers. The plaintiffs are Tommy Yancy's estate and his two children, Alexis and Jayden Yancy. The defendants are CHP Officers Caldera and Acevedo. Plaintiffs claim that Officers Caldera and Acevedo used excessive and unreasonable force against Mr. Yancy, and that such excessive and unreasonable force caused Mr. Yancy's death. Defendants deny liability and contend that their uses of force, which were all less-than-lethal, were reasonable and necessary to effect a lawful arrest of Mr. Yancy and to take him into custody.

# SUMMARY OF CAUSES OF ACTION AND DEFENSES

Plaintiffs assert two causes of action against Defendants:

1. A 42 U.S.C. § 1983 claim for excessive force in violation of Tommy Yancy's Fourth Amendment rights, for which the estate seeks survival damages. Defendants assert qualified immunity on the estate's Fourth Amendment claim.

2. A California State battery claim for unreasonable force by a police officer, for which the children seek wrongful death damages.

# STATEMENT OF FACTS

In the early afternoon of May 11, 2014, Defendant CHP Officer Gilbert Caldera was on patrol in the City of Imperial. He was a K-9 officer and had his police dog, Jambo, in the patrol car with him. While driving southbound on CA-86, Officer Caldera saw a car approaching from the opposite direction without a front license plate, in violation of the California Vehicle Code. Officer Caldera made a U-turn and activated his emergency lights to stop the vehicle.

Tommy Yancy was the driver and sole occupant of the car. He turned onto a side-street and stopped along the curb. Officer Calder approached Mr. Yancy's car

on the right side, and through the open passenger's window, he immediately recognized the strong odor of marijuana. Mr. Yancy immediately demanded to know why he had been stopped. Officer Caldera explained that he had stopped Mr. Yancy due to missing a front license place, and Mr. Yancy became argumentative. Officer Caldera asked Mr. Yancy for his license, registration, and proof of insurance multiple times, and Mr. Yancy continued to respond argumentatively.

Due to the odor of marijuana and Mr. Yancy's bizarre behavior, Officer Caldera stepped away from Mr. Yancy's vehicle and requested backup by radio. CHP Officer Heraclio Cardenas, who was patrolling nearby, responded within minutes. After Officer Cardenas arrived, the officers approached Mr. Yancy's driver's side door. Officer Caldera asked him to unlock the door, and he did, but he then refused Officer Caldera's request to exit the vehicle. Officer Caldera repeated his instruction to exit, and Mr. Yancy became increasingly agitated. He challenged Officer Caldera to "get me out."

Officer Caldera opened the door and reached for Mr. Yancy's left wrist. Mr. Yancy kicked toward Officer Caldera with his left foot and struck the car door. Officer Caldera attempted to close the door, but Mr. Yancy forcefully kicked it open and punched Officer Caldera in the right shoulder and arm. Officer Caldera backed away from the car and considered his options. He ultimately attempted to remotely release his canine, Jambo, from the patrol car, but the remote failed. He then returned to the patrol car to retrieve Jambo, while Officer Cardenas provided cover.

In the meantime, Mr. Yancy got out of his car and faced the two officers. Officer Caldera, returning with Jambo, instructed Mr. Yancy to get on the ground repeatedly, but Mr. Yancy refused to do so. Officer Caldera told him that if he would not get on the ground, he would release Jambo, who would bite. Mr. Yancy taunted the officers and challenged them to send the dog.

Officer Caldera released Jambo, who ran to Mr. Yancy and bit his left forearm. Mr. Yancy lifted Jambo off the ground and brought the dog to his chest. He wrapped Jambo's neck in a chokehold using his upper arm and forearm, and he punched Jambo in the torso and face repeatedly. He then began to choke Jambo. Officer Caldera attempted to pull Mr. Yancy to the ground and continued to instruct Mr. Yancy to get on the ground and stop resisting. Officer Cardenas used his ASP collapsible baton to strike Mr. Yancy twice in the upper thigh, and Mr. Yancy fell to the ground with his hands still wrapped around Jambo's neck. Mr. Yancy attempted to get back to his feet, and Officer Cardenas dropped his baton, drew his Taser, and fired it into Mr. Yancy's back. The Taser appeared to have no effect on Mr. Yancy, but Officer Caldera, who was physically engaged with Mr. Yancy, contacted the Taser wires and himself fell to the ground. Mr. Yancy continued to fight on the ground, but then suddenly stopped. Jambo was nonresponsive and convulsing, and Officer Caldera pulled him away from Mr. Yancy.

CHP Officer Robert Gonzales then arrived in response to Officer Caldera's request for backup. Mr. Yancy was lying on his back, and was verbally taunting the officers. As Officer Caldera attempted to revive Jambo, Officer Gonzales went over to Mr. Yancy and instructed him to roll into a prone position. As he did so, Jambo regained consciousness and Officer Caldera returned him to the patrol car. Officer Gonzales and Officer Caldera together secured Mr. Yancy in handcuffs.

Officer Gonzales radioed a request for paramedics to treat Mr. Yancy. Officer Caldera assisted Mr. Yancy to his feet and walked him back toward the patrol cars. As they walked, Mr. Yancy became agitated and continued to taunt the officers. He resisted walking with Officer Caldera. Suddenly, he lunged his head backward in an apparent effort to head-butt Officer Caldera, and he then tried to spin around and break away from Officer Caldera's control.

Officer Caldera grabbed Mr. Yancy and took him back to the ground. Officer Cardenas attempted to fire the Taser in drive-stun mode against Mr. Yancy's back,

but to no apparent effect. Mr. Yancy continued to struggle and kick the officers, who were together able to roll Mr. Yancy into a prone position. Additional CHP and El Centro police officers arrived and positioned themselves to attempt to restrain Mr. Yancy, who continued to buck and kick the officers off of him.

Suddenly, Mr. Yancy stopped struggling. He appeared to have lost consciousness. Officer Caldera rolled Mr. Yancy onto his side. The officers could not find a pulse, and determined that he had stopped breathing. They began to administer CPR, with both rescue breaths and chest compressions. Paramedics then arrived and took over care of Mr. Yancy. He never regained consciousness and was pronounced dead at the hospital later that afternoon.

The Medical Examiner declared the cause of death to be "agitated behavior associated with marijuana intake needing restraint and other unknown factors." The autopsy revealed that Mr. Yancy had an incomplete fracture at one end of his hyoid, which is a small bone in the throat. However, the Medical Examiner did not conclude that this incomplete fracture was itself the cause of Mr. Yancy's death.

## LEGAL STANDARDS FOR PLAINTIFFS' CLAIMS

### I. SECTION 1983 EXCESSIVE FORCE

The question of whether a police officer violated an individual's Fourth Amendment rights by using excessive force is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The officer's underlying intent or motivation is not relevant. *Id.* The plaintiff must prove that the officer's use of force was not objectively reasonable from the perspective of an officer on the scene. *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994.)

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at p. 396. Whether a use of force is reasonable must not be analyzed "with the 20/20

5

vision of hindsight." *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012, 2020 (2014). Rather, the analysis must "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." *Forrester, supra*, 25 F.3d at 807–08. Officers do not need to use "the least intrusive means of responding to an exigent situation." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

The Ninth Circuit applies a three-step analysis to determine whether a peace officer's use of force was objectively reasonable:

> First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. Second, we assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable.

*Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (citations omitted).

## II. BATTERY

The elements for civil battery by a police officer are: (1) the defendant intentionally touched the plaintiff; (2) the defendant used unreasonable force to arrest, prevent the escape, or overcome the resistance of plaintiff; (3) plaintiff did not consent to the use of that force; (4) the plaintiff was harmed; and (5) the use of unreasonable force was a substantial factor in causing plaintiff's harm. Judicial Council of Cal., Civil Jury Instruction (CACI) 1305. To determine whether an officer's use of force is "unreasonable," the jury considers, among other factors:

> (a) the seriousness of the crime at issue; (b) whether plaintiff appeared to pose an immediate threat to the safety of defendants or others; and (c) whether plaintiff was actively resisting arrest or attempting to evade arrest.

(CACI 1305).

The measure of whether an officer's conduct was unreasonable for a state law battery claim relies on the same standard applied in claims under the Fourth Amendment. *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004), citing *Graham v. Connor*, *supra*, 490 U.S. at 395. As in Fourth Amendment cases, the trier of fact must recognize that peace officers are often forced to make split-second judgments in tense circumstances regarding the amount of force required. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.*

**LEGAL STANDARD FOR DEFENDANTS' DEFENSE OF QUALIFIED IMMUNITY**

The doctrine of qualified immunity spares peace officers from civil lawsuits arising from civil rights violations except where an officer knowingly and unreasonably violates rights that are clearly established at the time of the incident. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "Qualified immunity is the rule, not the exception." *Rowe v. Schreiber*, 139 F.3d 1381, 1385 (11th Cir. 1998). The purpose of this immunity is to allow peace officers to discharge their duties without the risk of monetary liability. *Cousins v. Lockyer*, 568 F.3d 1063, 1069 (9th Cir. 2009). Peace officers "should not err always on the side of caution" for fear of being held financially liable. *Davis v. Scherer*, 468 U.S. 183, 196 (1984).

An official is entitled to qualified immunity against a Section 1983 action unless: (1) the facts, construed in the light most favorable to the plaintiff, establish a

violation of a right; *and* (2) the right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). Qualified immunity is not a question for the jury; it must be decided as a matter of law by the Court. *Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991).

When a defendant raises qualified immunity, the initial burden lies with the plaintiff to show that the rights were clearly established at the time of the incident. *Maraziti v. First Interstate Bank of California*, 953 F.2d 520, 523 (9th Cir. 1992). The Supreme Court has emphasized that courts are "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). There must be existing authority applying principles of law to specific facts sufficiently close to those encountered by the defendant at the time of the alleged violation so that every reasonable officer would know he was violating a right:

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every reasonable official would have understood that what he was doing violates that right." … We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Id.*

Qualified immunity is particularly important for peace officers, who must make decisions affecting constitutional rights in the field while facing rapidly-developing and dangerous situations, often with less-than-perfect information:

> It is often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation he faces. This is why "all by the plainly incompetent or those who knowingly violate the law" have immunity from suit; officers can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation.

*Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2001) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

The Supreme Court has reiterated that qualified immunity applies unless "the violative nature of *particular* conduct is clearly established," and that "[s]uch specificity is especially important in the Fourth Amendment context." *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quoting *Reichle, supra*, 132 S. Ct. at 2093) (emphasis in original). In a per curiam opinion, the Court held that the Fifth Circuit had improperly relied on too general a rule when analyzing whether there was "clearly established" law, and that reliance of authorities "too factually distinct to speak clearly to the specific circumstances here" is insufficient. *Id.* at 312.

Therefore, qualified immunity bars police officers from liability for Fourth Amendment violations unless existing case law establishes that the particular conduct in question—including the particular use of force under factually similar circumstances—was unlawful. Defendants intend to raise this issue with a motion pursuant to Federal Rule of Civil Procedure 50(a) at the appropriate time.

## DAMAGES

The standards for liability under Plaintiffs' two causes of action are similar, but the recoverable damages are different. For Plaintiffs' Section 1983 claim, Plaintiffs may only recover survivor damages that would have been recoverable by Mr. Yancy himself before his death. Although the California survivor statute, California Code of Civil Procedure, section 377.34 generally prohibits recovery of the decedent's pre-death pain and suffering in survivor claims, the Ninth Circuit has held that this limitation does not apply to Section 1983 claims. See *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014). Plaintiffs have misinterpreted this holding, and assert that they are entitled to recover not only Tommy Yancy's pre-death pain and suffering, but also post-death "loss of life" damages. As discussed below, such damages are not recoverable.

For their California law battery claim, Plaintiffs are entitled to recover wrongful death damages consisting of their own non-economic damages due to the

9

loss of their father. The Court ruled in response to motions in limine that evidence relating to Plaintiffs' relationship with their father, including multiple restraining orders obtained by Plaintiffs' mother against Tommy Yancy, evidence of the degree to which Tommy Yancy was present in their lives, and evidence of Tommy Yancy's psychiatric condition, is admissible for the limited purpose of damages.

I. **PLAINTIFFS ARE NOT ENTITLED TO RECOVER HEDONIC DAMAGES FOR THE LOSS OF TOMMY YANCY'S OWN LIFE IN THEIR SURVIVAL ACTION**

Plaintiffs' request for survival damages includes "hedonic damages for the loss of Tommy Yancy's own life." Pretrial Order at 3 (1.E.). However, their request is without support.

In *Chaudhry*, the Ninth Circuit held that "California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy. [Cal. Civ. Proc. Code] Section 377.34 therefore does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law." [1] *Chaudhry* at 1105.[2] However, *Chaudhry* did <u>not</u> hold that damages for loss of life are recoverable.

---

[1] Cal. Civ. Proc. Code § 377.34 provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

[2] A California court reached a different conclusion, in *Garcia v. Superior Court*, 42 Cal. App. 4th 177 (1996): "In conclusion, California law allows the representative of a decedent's estate to sue on decedent's cause of action arising before death and for punitive damages decedent would have been entitled to had he survived; California law also allows a decedent's survivors to sue for wrongful death for their pecuniary losses and their loss of decedent's comfort and society. In our opinion these provisions of state law suffice to fulfill the compensatory and deterrent purposes of the federal Civil Rights Act in a case where the civil rights violation caused the death. Therefore, California law is not inconsistent with the law of the United States. We are not compelled by any United States Supreme Court authority to adopt a foreign rule of damages allowing plaintiff to recover for decedent's pain and suffering or for "hedonic" damages, and we are not persuaded by the lower federal court decisions allowing such damages." *Garcia* at 187-188.

The Ninth Circuit has cited the *Chaudhry* rule in three subsequent decisions: *Willis v. City of Fresno*, 680 Fed. Appx. 589, 592 (9th Cir. Mar. 1, 2017); *Fernandez v. Virgillo*, 651 Fed. Appx. 692, 693 (9th Cir. June 10, 2016); *Zerby v. City of Long Beach*, 637 Fed. Appx. 1008, 1011 (9th Cir. Feb. 4, 2016). In none has the Ninth Circuit expanded the rule to include anything other than pre-death damages. In fact, in *Willis*, the Ninth Circuit appears to have tightened up its holding: "this court held [in Chaudhry] that § 377.34 limits recovery too severely to be consistent with the deterrence policy underlying 42 U.S.C. § 1983, and that plaintiffs may therefore seek damages for pre-death pain and suffering under § 1983 when the decedent's death was caused by the violation of federal law." *Willis* at 592. In short, the Ninth Circuit has never authorized loss of life damages despite several opportunities to do so.

The Tenth Circuit formulated a federal rule for damages § 1983 survival claims in *Berry v. Muskogee*, 900 F.2d 1489 (10th Cir. 1990): "We believe appropriate compensatory damages would include medical and burial expenses, *pain and suffering before death*, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions." *Berry* at 1507 (italics added). The Eighth Circuit followed *Berry*. *Andrews v. Neer*, 253 F.3d 1052, 1063-1064 (8th Cir. 2001). Neither circuit included "loss of life." *Berry* was cited in *Chaudhry*, but the Tenth Circuit's rule was not adopted.

To allow damages for loss of life in survival actions would also appear inconsistent with common law. At common law, a cause of action for personal injuries did not survive the death of the injured party. However, states such as California have abrogated the common law rule by enacting "survival statutes." See Cal. Civ. Proc. Code § 377.20. These statutes do not create a cause of action; they simply prevent abatement of causes of action that existed at the time of death. There of course can be loss of life before death.

Plaintiffs have suggested that "loss of enjoyment of life" and "loss of life" are synonymous, and that inclusion of the phrase "loss of enjoyment of life" in Ninth Circuit Model Jury Instruction 5.2 ("Measures of Types of Damages) supports their request. No so. First, there is no authority for such an argument. Second, 5.2 is a generic instruction, intended to be used in many types of actions. Third, the phrases are not synonymous. "Loss of enjoyment of life" (also known as "hedonic" damages) is a component of pain and suffering damages. See *Luth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 766 (1998) (improper to instruct separately on "loss of enjoyment of life" and "pain and suffering"). "Loss of enjoyment of life" refers to impairment of life activities, such as loss of taste or smell, and necessarily assumes continued life. "Loss of life" of course means something very different. In short, "loss of enjoyment of life" and "loss of life" are not synonymous.

Defendants acknowledge that under *Chaudhry*, the estate is entitled to claim damages for pre-death damages, including "loss of enjoyment of life" – but only if the jury is instructed that all such damages are cut off at the time of death. There continues to be no controlling authority authorizing damages for loss of death in a § 1983 survival claim and no common law right to sue for one's own death.

## II. EVIDENCE OF TOMMY YANCY'S PSYCHIATRIC AND CRIMINAL HISTORY IS ADMISSIBLE FOR THE LIMITED PURPOSE OF DAMAGES

Plaintiffs' Motion in Limine to Exclude Evidence of Decedent's Past Psychological and Criminal History (Docket No. 122), sought to exclude evidence of Tommy Yancy's criminal history, including multiple restraining orders that Plaintiffs' mother sought and obtained against him, as well as Tommy Yancy's history of schizophrenia and post-traumatic stress syndrome. At the November 16, 2017 hearing on motions in limine, the Court noted that such evidence is relevant and admissible for the issue of wrongful death damages. Specifically, it goes to show the nature of the relationship between Tommy Yancy and the Plaintiffs.

Additionally, if Plaintiffs are permitted to seek recovery of post-death survivor damages for the loss of Tommy Yancy's life, such evidence would be directly relevant to the quality of his life. Therefore, while Plaintiffs correctly note in their Trial Brief that the Court stated that such evidence is would not be admissible for purposes of liability, it incorrectly states that such evidence is "Precluded" entirely.

## ANTICIPATED EVIDENTIARY ISSUES

Defendants wish to bring the following evidentiary concerns to the Court's attention before the commencement of trial.

### I. EVIDENCE OF CHP'S INVESTIGATION INTO THE INCIDENT SHOULD BE EXCLUDED

Plaintiffs have served a trial subpoena on CHP Sergeant Eric Nicholas and have indicated that they intend to call him as a witness on Monday, January 22. Sergeant Nicholas was tasked with internally investigating Mr. Yancy's death on behalf of CHP, and he ultimately prepared a detailed report on the incident, including his conclusions that no CHP officer had acted inappropriately. The precise nature of the testimony Plaintiffs intend to elicit from Sergeant Nicholas is unclear, but any effort to obtain factual or legal conclusions from Sergeant Nicholas arising from his investigation would be improper. Since Sergeant Nicholas's inquiry virtually mirrored that which the jury will undertake—to determine whether CHP Officers used unreasonable force against Mr. Yancy—his conclusions amount to opinions of an undesignated expert concerning the ultimate questions for the jury.

### II. PHOTOGRAPHS FROM TOMMY YANCY'S AUTOPSY AND FROM THE EMERGENCY ROOM SHOULD BE EXCLUDED

Plaintiffs have identified as exhibits a total of 74 photographs of Mr. Yancy's body taken in the Emergency Room after his death, and 58 photographs of his body taken during his autopsy. (Exhibit 3.) There is no dispute that Mr. Yancy died, or of

the nature or extent of the injuries that are depicted in these photographs. They appear to be offered solely for the purpose of emotionally manipulating the jury with gory photographs of Mr. Yancy's body. Defendants therefore intend to object to their admission under Federal Rules of Evidence 402 and 403.

### III. AUTHENTICITY AND ADMISSIBILITY OF VIDEO EVIDENCE

There are eight videos that have been identified as Exhibits in his matter. (Exhibits 200–207.) Each of those videos contains multiple sub-parts that represent enhanced versions, and versions with or without audio. The authenticity of several original videos is disputed, as the versions of those videos contain abnormalities that will require additional evidence to satisfy the requirements of Federal Rule of Evidence 901. The parties have agreed that if and the original videos are properly authenticated and admitted, no additional foundation will be necessary to admit the enhanced versions.

## CONCLUSION

Defendants are prepared for trial.

Dated: January 16, 2018

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
RICHARD F. WOLFE
Supervising Deputy Attorney General
TERRY R. PRICE
Deputy Attorney General

/s/ Edward P. Wolfe

EDWARD P. WOLFE
Deputy Attorney General
*Attorneys for Defendants*
*CHP Officer Gilbert Caldera and*
*CHP Officer Salvador Acevedo*

SD2015700805
81922051.docx

14

# CERTIFICATE OF SERVICE

Case Name:  **Yancy, et al. v. State of California (CHP), et al.**  Case No.  **15-cv-0580 JM (PCL)**

I hereby certify that on **January 16, 2018**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' TRIAL BRIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **January 16, 2018**, at San Diego, California.

          A. Lopez                                    *[signature]*
          Declarant                                    Signature

SD2015700805
81922045.docx